**In the Matter of the WELFARE OF the CHILD OF J.K.T. and A. M., Parents.**

No. A11–1576.

Court of Appeals of Minnesota.

May 21, 2012.

William M. Ward, Chief Fourth District Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, MN, for appellant mother.

Michael O. Freeman, Hennepin County Attorney, Michelle A. Hatcher, Assistant County Attorney, Minneapolis, MN, for respondent Hennepin County.

Jane E. Maschka, Faegre, Baker and Daniels L.L.P., Minneapolis, MN, for respondent guardian ad litem.

Considered and decided by RODENBERG, Presiding Judge; HALBROOKS, Judge; and ROSS, Judge.

## OPINION

RODENBERG, Judge.

In this appeal, we must determine whether the death of a child pending his mother's appeal from a final order terminating her parental rights affects the appeal. We conclude that the termination order remains ripe for review because (1) the abatement doctrine advanced by appellant-mother has not been adopted by Minnesota courts or the legislature; (2) the appeal concerns appellant's constitutional rights; (3) the appeal was perfected before the child's death; (4) the district court no longer has jurisdiction to convert the involuntary termination order to a voluntary one; and (5) the appeal is not moot because collateral consequences attach to the termination order. Upon reviewing the merits of the appeal, we conclude that the district court did not err in finding that termination was warranted on four statutory grounds and was in the child's best interests.

## FACTS

### I. Background

Appellant challenges the involuntary termination of her parental rights to her son, J.M. The child, who was ten years old at the time of trial, had extensive medical needs. He was developmentally delayed and suffered from numerous disorders, including congenital microcephaly, cerebral palsy, epilepsy, seizure disorder, scoliosis, asthma, and hip dysplasia. He was non-verbal and non-ambulatory.

J.M.'s extraordinary medical needs demanded constant care and specialized attention. He had to be monitored twenty-four hours a day, in case a seizure impeded his ability to breathe, and his seizures had to be recorded to assist doctors in treating him. To avoid falls, he had to be properly strapped into his wheelchair, and the rail-

ings on his bed always had to be kept in the upright position. His diapers had to be regularly changed to prevent sores, and the sites where tubes entered his body had to be cleaned, irrigated, and checked for infection on a frequent basis. Because J.M. carried an antibiotic-resistant strain of bacteria, his caregivers had to be particularly sensitive to preventing bed sores and other open wounds, which could become life-threatening.

J.M. could not swallow, so he received his medications and nutrition through a feeding tube. A special formula had to be pumped through the tube eighteen hours per day, and his nutrition had to be carefully monitored. J.M. took multiple medications each day and needed nebulizer treatments twice per day to prevent asthma attacks. His inability to swallow posed a risk that he could choke or develop skin problems from excess saliva, so he had to be carefully positioned and kept dry.

J.M.'s special needs required meticulous coordination and follow-up with numerous healthcare providers. Because he required round-the-clock care, in-home nursing and personal-care-attendant (PCA) services were essential. Additionally, at the time of trial, J.M. was scheduled to have major surgery two months later. The surgery would require him to wear a body cast for five to six weeks, and it was critical that he receive a meticulous level of care during his recovery.

## II. Pre-appeal procedural history

### A. First CHIPS petition

J.M. was first removed from appellant's care in July 2009. Police had entered the home to assist with a utility shut-off and discovered J.M. left unattended. The house was strewn with detritus and garbage. J.M.'s diaper was filled with waste, and his feeding tubes and pump were covered with human waste. Based on this incident, respondent-Hennepin County filed a child in need of protection or services (CHIPS) petition. Appellant admitted to the allegations in the petition. After about three months in foster care, in November 2009, J.M. returned to appellant's care under protective supervision.

In January 2010, appellant's in-home PCA agency discharged J.M. as a client. The agency discontinued service because appellant had been uncooperative in a number of ways. For example, she would not let nurses into the home in a timely manner, she refused necessary overnight care for the child, she was difficult to contact, and she did not cooperate with the nurses.

### B. Medical neglect

While back in appellant's care, J.M. repeatedly missed medical appointments. Appellant failed to follow up with healthcare providers regarding his nutritional progress, seizure activity, and lab results, all of which were critical to J.M.'s precarious health. The child's healthcare providers and school nurse were unable to contact appellant for months at a time because her telephone numbers were often disconnected. Appellant's failure to stay in touch severely limited the health care providers' ability to properly assist with J.M.'s care.

In 2009, J.M.'s pediatric neurologist, Dr. Gilles, placed him on a specialized Ketogenic diet to help control his seizures. The diet required strict adherence and regular weight checks. By February 2009, while in appellant's care and on the specialized diet, J.M.'s weight dropped from 55 pounds to 35 pounds. Dr. Gilles testified that the only explanation for this drastic weight loss was medical neglect. J.M. entered what Dr. Gilles described as "starvation mode." He lost all prior progress,

including his ability to show signs of communication. J.M. likely sustained permanent damage from lack of proper nutrition. According to Dr. Gilles, absent medical intervention, J.M. would have died at that point.

### C. Second CHIPS petition

Hennepin County received a medical-neglect report regarding J.M. in April 2010. When appellant brought J.M. to a medical appointment that month, he weighed only 45 pounds (ranking in the second percentile for his age group), and lab work indicated he had not been receiving a required seizure medication on a regular basis. J.M. was admitted to the hospital for suspected failure to thrive.

Hennepin County filed a CHIPS petition and obtained an ex parte emergency protective-care order. J.M. was subsequently discharged from the hospital and placed in the foster home of a former nurse who was experienced in caring for children with special needs. Appellant waived her right to a CHIPS trial and admitted the allegations in the petition alleging J.M. to be a child in need of protective services.

### D. Petition for termination of parental rights

Following the second CHIPS petition, the district court ordered appellant to comply with a case plan requiring her to complete in-home parenting education, have supervised visits with J.M., and attend his medical appointments, all with the goal that she demonstrate an appropriate understanding of the child's specific medical needs. On February 3, 2011, Hennepin County filed a petition for involuntary termination of appellant's parental rights to J.M.

Hennepin County alleged that, following J.M.'s placement in foster care, appellant did not make sufficient progress in improving the organizational and communication skills necessary to coordinate the child's care. She was unaware of J.M.'s medical appointments despite reviewing her weekly schedule with a parenting educator. J.M.'s foster mother, case workers, health care providers, and guardian ad litem all testified that appellant was very difficult to reach, and they had considerable difficulty coordinating J.M.'s medical care with her.

During visits with J.M., appellant was often distracted by her younger daughter. On at least six occasions, appellant left the railings down on J.M.'s bed and then left the room. It was undisputed that leaving the railings down for even a moment could result in the child's injury or death if he fell out of the bed. Appellant failed to properly secure J.M. in his wheelchair on at least one occasion, a mistake which also could have seriously injured him.

Appellant often demonstrated an insufficient understanding of the child's medical needs. For example, J.M. did not have an age-appropriate "stander," a therapeutic device necessary for improving J.M.'s bone and muscle development, because appellant refused to turn over his old standers to the insurance company. On several occasions, appellant persisted in touching J.M.'s feet and head, causing him obvious discomfort due to his hypersensitivity in those areas. J.M.'s pediatrician, Dr. Chawla, testified that appellant did not demonstrate a sufficient understanding of the "big picture" regarding J.M.'s medical needs.

While in foster care the second time, J.M.'s health significantly improved. His weight nearly doubled, and he received round-the-clock care from his foster parents and PCA nurses. Numerous witnesses testified that J.M. received excellent care and thrived while in foster care. His foster mother, guardian ad litem, and

pediatrician all testified that they did not believe appellant was capable of providing the level of care required for the child's survival.

Following a six-day trial, the district court found that, although appellant completed her case plan, she failed to correct the actual conditions leading to J.M.'s out-of-home placement. It further found that appellant lacked the ability to provide the high level of care necessary for J.M.'s survival.

The district court found that terminating appellant's parental rights was in J.M.'s best interests. It concluded that termination was supported by clear and convincing evidence of four separate statutory grounds: (1) failure to meet parental duties under Minn.Stat. § 260C.301, subd. 1(b)(2) (2010); (2) palpable unfitness under Minn.Stat. § 260C.301, subd. 1(b)(4) (2010); (3) failure to correct the conditions requiring out-of-home placement under Minn.Stat. § 260C.301, subd. 1(b)(5) (2010); and (4) the child was neglected and in foster care within the meaning of Minn. Stat. § 260C.301, subd. 1(b)(8) (2010).[1]

### III. Subsequent history

Appellant filed a notice of appeal on September 6, 2011. J.M. died on November 25, 2011. In light of his death, appellant filed a motion to stay the appeal and to strike the appearance and brief of the guardian ad litem. Appellant requested that we remand the case to district court to address a possible stipulation with the county that would convert the involuntary termination order into a voluntary one. We denied the motion, concluding that J.M.'s death did not deprive the guardian ad litem of standing as a party to the appeal, and noting that it was not clear whether the district court retained jurisdiction or authority to grant the relief sought by appellant.

Following oral argument, appellant filed a motion to submit a post-argument memorandum addressing her assertion that the abatement doctrine, applicable to criminal cases in other jurisdictions, supports vacating and dismissing the petition or converting this case to a voluntary termination. Hennepin County and the guardian ad litem filed responsive memoranda opposing application or adoption of the abatement doctrine in juvenile protection cases.

We have considered all of the parties' supplemental memoranda. The matter was deemed submitted on April 6, 2012.

### ISSUES

I. Does the mootness doctrine preclude us from addressing the appeal because no effectual relief is available?

II. Does the doctrine of abatement permit this court to vacate and dismiss the termination petition or to remand the case to the district court to allow its conversion to a voluntary termination?

III. Did the district court err in finding that clear and convincing evidence supported termination of appellant's parental rights on four statutory grounds despite appellant's completion of her case plan?

IV. Did the district court err in finding that termination of appellant's parental rights was in the child's best interests?

V. Did the district court abuse its discretion by admitting opinion testimony, documents containing hearsay, and documentary evidence that was unfairly prejudicial?

1. J.M.'s father, A.M., made no appearance at the termination trial, and his parental rights to J.M. were also terminated. The father has not appealed.

## ANALYSIS

### I.

As a threshold issue, the county argues in its brief that the appeal is moot because J.M. has died. It argues that no effectual relief is available as the district court lacks jurisdiction to determine parental rights to a child who is not living. *See* Minn.Stat. §§ 260C.007, subd. 4, .101, subd. 1 (2010) (establishing that juvenile court has jurisdiction over "child," meaning individual under age 18). At oral argument, however, the county abandoned this position and now urges this court to address the merits of the appeal. We address the mootness issue on the merits because doing so assists in the discussion of appellant's abatement argument.

■ Mootness is a jurisdictional issue that may be raised at any time. *In re Schmidt,* 443 N.W.2d 824, 826 (Minn.1989). The doctrine requires this court to decide only actual controversies, and to refrain from issuing advisory opinions. *Id.* If there is "no injury that a court can redress, the case must be dismissed for lack of justiciability," except in limited circumstances. *State ex rel. Sviggum v. Hanson,* 732 N.W.2d 312, 321 (Minn.App.2007).

■ A recognized exception to the mootness doctrine permits appellate review if collateral consequences arise from the challenged ruling. *Pechovnik v. Pechovnik,* 765 N.W.2d 94, 97 (Minn.App. 2009). If the ruling imposes "real and substantial limitations," courts will presume that collateral consequences attach. *Id.* at 97–98. This presumption can be rebutted only if the opposing party shows there is *no* possibility of collateral consequences. *Id.* at 98.

■ Here, the order involuntarily terminating appellant's parental rights results in a statutory presumption that she is palpably unfit to parent other children.[2] *See* Minn.Stat. § 260C.301, subd. 1(b)(4) (2010). In any future proceedings to terminate her rights to a child, the burden of proof would essentially be reversed as a result of the presumption: appellant would have the burden of rebutting the presumption, and the district court would not have to find independent reasons for the termination. *In re Welfare of D.L.R.D.,* 656 N.W.2d 247, 250 (Minn.App.2003). Additionally, the county would not be required to make reasonable efforts to facilitate reunification in a case involving a different child of appellant, as would otherwise be the county's obligation. *See* Minn.Stat. § 260.012(a) (2010) (exempting reasonable efforts requirement where parent's rights to another child have been terminated involuntarily). The termination order thus imposes real and substantial limitations on appellant's ability to defend against possible future termination proceedings. *Cf. In re McCaskill,* 603 N.W.2d 326, 329–30 (Minn.1999) (concluding that increased statutory burden on appellant resulting from involuntary civil commitment order posed collateral consequences, and appeal was therefore not moot even though appellant's commitment had been terminated); *Pechovnik,* 765 N.W.2d at 98 (concluding that an order for protection posed collateral consequences because it could affect child custody determinations).

The county originally argued that the statutory presumption would be narrowly construed in any future proceeding, given J.M.'s rare and extensive medical needs. But the statute does not limit the presumption based on unique circumstances, and the county cannot demonstrate that other counties would treat the presumption so narrowly as it proposes that it

---

**2.** Appellant presently retains parental rights to another child.

would do. Nor can it show that there is *no* possibility that collateral consequences, in the form of a statutory presumption of palpable unfitness, will arise.

We conclude that collateral consequences attach to the termination order because it may affect any future termination proceedings against appellant. As a result, the appeal is not moot.

## II.

Appellant argues that the doctrine of abatement, which applies to criminal cases in other jurisdictions, permits this court to vacate and dismiss the order terminating her rights to J.M., or to remand the matter for possible conversion into a voluntary termination order. Although the county may have initially supported converting the order to a voluntary termination, it now opposes appellant's position, contending that this court must address the appeal based on the facts in existence when the termination order was issued. The guardian opposes vacating the order for any reason.

### A. Dismissal of termination order

■ The doctrine of abatement provides that the death of a criminal defendant while an appeal is pending nullifies the entire proceeding, including the conviction. *Bevel v. Commonwealth*, 282 Va. 468, 717 S.E.2d 789, 793 (2011). The purpose of the doctrine is to prevent an untested conviction from standing in the wake of the defendant's death. *United States v. Estate of Parsons*, 367 F.3d 409, 415 (5th Cir.

2004). State and federal courts have applied multiple forms of abatement, some vacating the conviction ab initio, others dismissing only the appeal. *Bevel*, 717 S.E.2d at 793–94. Although the majority of state and federal courts apply some form of abatement, the more recent trend has been toward limiting, modifying, or dispensing with the doctrine. *Id.* at 794; *see also State v. Carlin*, 249 P.3d 752, 758–63 (Alaska 2011) (overruling prior application of abatement ab initio doctrine because it undermined rights of crime victims, ignored financial consequences of conviction, and vitiated presumption that defendant is guilty following conviction).[3]

■ Appellant has not identified any authority indicating that Minnesota has adopted the abatement doctrine. In the only Minnesota case that appellant cites, the relator challenged his conviction for contempt of court, but he died pending a determination on his writ of certiorari. *In re Carlton*, 285 Minn. 510, 510, 171 N.W.2d 727, 728 (1969). In a four-sentence per curiam opinion, the supreme court discharged the writ of certiorari because "the pending appellate proceeding has become moot." *Id.* Appellant acknowledges that *Carlton* did not expressly or impliedly address the abatement doctrine.

Appellant essentially requests that we not only adopt the abatement doctrine, but also extend it to proceedings involving the termination of parental rights. Even if the Minnesota courts were to adopt the doctrine of abatement, it is doubtful that

---

**3.** The abatement doctrine, as applied in criminal cases, implicates a number of policy concerns. Although the doctrine was historically based on the view that criminal convictions serve a purely punitive function, modern views have shifted to a broader view of the criminal justice system. *Carlin*, 249 P.3d at 758; *Bevel*, 717 S.E.2d at 794 (recognizing that abatement rests on the outdated premise

"that criminal convictions and sentences serve only to punish the convicted."). Abatement undermines those goals, including the rights of crime victims and society's interest in acknowledging the offense. *Carlin*, 249 P.3d at 759. Abatement may also affect the financial consequences of a conviction, such as restitution. *Id.* at 764.

the doctrine would be extended to cases involving termination of parental rights. Abatement rests primarily on the dual rationales that (1) the party in interest is no longer living and (2) his rights to an appeal cannot be vindicated. *Carlin*, 249 P.3d at 762; *Whitehouse v. State*, 266 Ind. 527, 364 N.E.2d 1015, 1016 (1977). Here, although the child's best interests were the central focus of the termination proceedings, appellant remains a real party in interest. The termination order concerns *her* constitutional rights. *See generally Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972) (recognizing fundamental right of parents to care for their children). Appellant concedes that she faces collateral consequences flowing from the termination order. Moreover, appellant's right to pursue the appeal has not been jeopardized. A final termination order is therefore fundamentally different from a criminal conviction.

In light of the absence of authority for abatement in Minnesota, we decline to adopt or apply the abatement doctrine in this case. As the common law of Minnesota does not recognize the abatement doctrine, these concerns are best left to the legislature. *Accord Bevel*, 717 S.E.2d at 794–95 (recognizing that legislature is best forum for advancing abatement doctrine); *see also In re Trusteeship of Trust of Williams*, 631 N.W.2d 398, 410 (Minn.App. 2001) (noting that role of this court is primarily to apply the law, not to make legislative or doctrinal decisions), *review denied* (Minn. Sept. 25, 2001). If this court were to accept appellant's invitation to not only adopt abatement but also apply it in the context of termination proceedings, we would exceed the limited error-correcting role of this court. *See Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988) (asserting that the scope of this court's review is narrowly defined and "limited to identifying errors and then correcting them").

**B. Remand for possible conversion to voluntary termination order**

With respect to appellant's alternative proposal that this court remand the case to the district court to accommodate appellant's willingness to stipulate to a voluntary termination of her parental rights to J.M., we observe that the district court's jurisdiction to convert this involuntary termination order into a voluntary one is doubtful. There is no longer a living child as to whom rights could be terminated. *See* Minn.Stat. §§ 260C.007, subd. 4, .101, subd. 1 (establishing juvenile court's jurisdiction over "child," meaning individual under age 18). Moreover, in order to voluntarily consent to a termination order, appellant would have to demonstrate a factual basis of good cause centering on the child's best interests, a requirement that would now be impossible to fulfill. *See* Minn.Stat. § 260C.301, subds. 1(a) (permitting voluntary termination upon good cause), 7 (2010) (providing that the child's best interests are paramount in both voluntary and involuntary terminations).

Because appellant perfected this appeal *before* J.M. died, the only appropriate course under the rare and unfortunate circumstances of this case is to address the merits of the appeal. We recognize the tragic situation appellant now faces in defending her parental rights to a child who died while in foster care. But the issue on appeal is not whether, indulging in the benefit of hindsight, the district court selected the most favorable of all possible courses for J.M. Rather, the appeal concerns the validity of the termination order at the time it was entered, based upon facts and evidence of record at that time. We must therefore confine our analysis to

the record before the district court at the time it entered the termination order. *See Plowman v. Copeland, Buhl & Co.,* 261 N.W.2d 581, 583 (Minn.1977) (articulating well-settled principle that appellate courts must not base decisions on matters outside record on appeal).

## III.

Appellant argues that the district court erred in terminating her parental rights despite her completion of the case plan. She argues that clear and convincing evidence does not support termination under the four statutory grounds.

 Parental rights may be terminated only for "grave and weighty reasons." *In re Child of E.V.,* 634 N.W.2d 443, 446 (Minn.App.2001) (quotation omitted). Courts must presume that natural parents are fit to be entrusted with the care of their children. *In re Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn.1980). The petitioner has the burden of overcoming this presumption. *Id.* at 155. It must prove by clear and convincing evidence that the parent is unfit under at least one of nine statutory grounds. Minn.Stat. § 260C.301, subd. 1(b) (2010); *Clausen,* 289 N.W.2d at 155.

 We review an order terminating parental rights to determine whether the district court's findings (1) address the statutory criteria and (2) are supported by substantial evidence. *In re Welfare of Children of S.E.P.,* 744 N.W.2d 381, 385 (Minn.2008). We must "closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of J.M.,* 574 N.W.2d 717, 724 (Minn.1998). Ultimately, however, we review the factual findings for clear error and the statutory basis for abuse of discretion. *In re Welfare of Children of J.R.B.,* 805 N.W.2d 895, 901 (Minn.App. 2011), *review denied* (Minn. Jan. 6, 2012).

A finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Children of T.R.,* 750 N.W.2d 656, 660–61 (Minn.2008) (quotation omitted). An abuse of discretion occurs if the district court improperly applied the law. *Dobrin v. Dobrin,* 569 N.W.2d 199, 202 (Minn.1997).

### A. Failure of reasonable efforts to correct conditions leading to out-of-home placement

Appellant challenges the district court's conclusion that termination was justified because reasonable efforts failed to correct the conditions leading to J.M.'s out-of-home placement. Parental rights may be terminated if, "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn.Stat. § 260C.301, subd. 1(b)(5). A parent's failure to comply with a reasonable case plan results in a presumption that the parent has failed to correct the conditions leading to out-of-home placement. *Id.,* subd. 1(b)(5)(iii).

The district court found that appellant completed the case plan and "cooperated with case plan services." But it went on to find that appellant failed to *actually correct* the conditions leading to foster care, and that J.M.'s specific needs had been met only while in out-of-home placement. Appellant argues that if a parent's successful completion of a case plan nonetheless results in failure, the county must not have made reasonable efforts. She also challenges the court's finding that she failed to actually correct the conditions leading to out-of-home placement. We address each argument in turn.

### 1. Reasonable efforts

Reasonable efforts encompass more than just a case plan. The statutory definition concerns the "exercise of due diligence by the responsible social services agency to use culturally appropriate and available services to meet the needs of the child and the child's family." Minn.Stat. § 260.012(f) (2010). In determining whether the agency made reasonable efforts, the court must consider whether it offered services that were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn.Stat. § 260.012(h) (2010). It must also consider "the length of time the county was involved and the quality of effort given." *In re Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn.App.1990), *review denied* (Minn. July 6, 1990). The county's efforts must be aimed at alleviating the conditions that gave rise to out-of-home placement, and they must conform to the problems presented. *In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn.1996); *H.K.*, 455 N.W.2d at 532. The services must be culturally appropriate, and "the child's best interests, health, and safety must be of paramount concern." Minn. Stat. § 260.012(a).

The district court's findings address each of these factors, and there was substantial evidence in the record that the county made reasonable efforts to reunite appellant with J.M. The case plan set forth specific steps to assist appellant with developing the skills necessary to ensure J.M.'s health and welfare. It required appellant to participate in various services, including a psychological evaluation, in-home parenting education, attendance at medical appointments, and supervised visitation. The overarching goal of the case plan was to assist appellant in demonstrating a proper understanding of the child's medical needs and gaining the capacity to put that understanding into practice. The district court found that this plan was reasonable and addressed the reason for out-of-home placement: appellant's failure to coordinate care, communicate with care providers, and otherwise meet the highly specific needs of the child, which resulted in his medical neglect.

In addition to the case plan, the county made other significant efforts to reunite appellant with J.M. In 2009, the county provided appellant with developmental disability services and arranged to install a wheelchair ramp and tub lift in appellant's home. But the equipment was never installed because the vendors were unable to contact appellant, despite repeated efforts to reach her at several phone numbers. Dakota County also offered appellant developmental-disability services, but terminated its services due to appellant's noncompliance and failure to communicate. After the first CHIPS petition, Hennepin County returned J.M. to appellant, but the child went into "starvation mode" and likely sustained permanent damage while in her care. Appellant was unable to retain the crucial services of an in-home PCA agency because she failed to coordinate and communicate with the care providers. Following the second CHIPS petition, the county arranged for appellant to participate in several family care conferences to help her to avoid or prevent the recurrence of the events that precipitated the county's intervention. Additionally, as part of the parenting education program, educators reviewed appellant's weekly schedule with her to develop her organizational skills, which were critical in coordinating the child's medical care.

In light of this evidence, the district court specifically found that the county

had made reasonable efforts by "offer[ing] services that were timely, available, relevant and culturally appropriate." The county exerted great efforts to assist appellant in being able to provide an appropriate level of care for J.M., despite appellant's having repeatedly placed J.M.'s health in serious jeopardy. Substantial evidence supports the court's finding that the county exerted reasonable efforts. Appellant's bare compliance with the case plan does not mandate a contrary conclusion.

## 2. Failure to correct conditions

■ Appellant also argues that because she completed her case plan, clear and convincing evidence does not support termination under this statutory ground. The statute presumes that failure to complete the case plan amounts to a failure to correct the conditions leading to out-of-home placement. Minn.Stat. § 260C.301, subd. 1(b)(5)(iii). But there is no converse presumption that completion of the case plan amounts to a correction of those conditions. *See id.*

■ A parent's substantial compliance with a case plan may not be enough to avoid termination of parental rights when the record contains clear and convincing evidence supporting termination. *See In re Welfare of Maas,* 355 N.W.2d 480, 483 (Minn.App.1984) (affirming that mother's substantial compliance with court-ordered parenting sessions, psychological treatment, and sobriety were insufficient to avoid termination given her negative track record and poor prognosis for long-term improvement). The critical issue is not whether the parent formally complied with the case plan, but rather whether the parent is presently able to assume the responsibilities of caring for the child. *In re Welfare of J.L.L.,* 396 N.W.2d 647, 651 (Minn.App.1986).

The condition leading to J.M.'s out-of-home placement was appellant's medical neglect of the child and her inability to provide the high level of care necessary for J.M.'s survival. These deficiencies were compounded by her profound inability to coordinate, communicate, and follow through with J.M.'s care providers, resulting in his drastic weight loss and starvation while in appellant's care.

■ The record contains substantial evidence that, despite appellant's formal compliance with the case plan steps, she continued to exhibit an inability to properly care for the child. Dr. Chawla testified that appellant continued to focus on minor issues regarding J.M.'s medical care and lost sight of the big picture. When J.M. lost a significant amount of weight leading up to the second CHIPS petition, appellant did not demonstrate an appropriate level of concern, and she did not seem to understand the seriousness of J.M.'s condition. Dr. Chawla testified that by the time of trial, appellant still had not been able to demonstrate an ability to provide an adequate level of care for J.M.

The record establishes that appellant was unable to consistently manage J.M.'s medical appointments. Numerous witnesses, including health care providers, case workers, and the child's foster mother, testified that they consistently had difficulties reaching appellant. Parenting educators reported that appellant was unaware of J.M.'s upcoming medical appointments, even though they regularly reviewed the schedule with her. The record supports the district court's finding that these communication difficulties made returning J.M. to appellant's care impossible to safely accomplish.

Appellant denied the allegations concerning her communication difficulties and claimed that she had arranged for in-home PCA services, nursing services, and occu-

pational and physical therapy for J.M. After weighing the conflicting testimony, the district court found appellant not credible. As the district court was in the best position to assess the witnesses' demeanor, we defer to its credibility determination. *See In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn.1996) (deferring to the district court's credibility determinations).

The district court was faced with an exceedingly difficult situation given J.M.'s history of medical neglect in appellant's care. J.M. was returned to appellant's care after the first CHIPS petition, only to languish and nearly starve to death, requiring his removal from appellant's home a second time. Dr. Gilles testified that J.M.'s starvation could only have been caused by medical neglect. Appellant had not demonstrated by the time of trial that she had the present ability to resume caring for J.M., nor the capacity to do so in the reasonably foreseeable future. Given the extensive evidence in the record and the district court's province in making credibility determinations, we conclude that substantial evidence supports its finding that appellant failed to correct the conditions leading to J.M.'s out-of-home placement. The district court did not abuse its discretion in ordering termination on this basis.

**B. Failure to comply with parental duties**

■■■■■ Appellant next argues that termination was not warranted by reason of her failure to comply with parental duties because (1) the county did not adduce clear and convincing evidence and (2) the court's findings did not address the statutory requirements. Parental rights may be terminated if "the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed ... by the parent and child rela-

tionship." Minn.Stat. § 260C.301, subd. 1(b)(2). Those duties include providing food and "other care and control necessary for the child's physical, mental, or emotional health and development." *Id.* The court must find that at the time of termination, the parent is not "presently able and willing to assume his responsibilities" and that the parent's neglect of these duties "will continue for a prolonged, indeterminate period." *In re Welfare of J.K.*, 374 N.W.2d 463, 466–67 (Minn.App.1985) (quotation omitted), *review denied* (Minn. Nov. 25, 1985). As with the other grounds, the court must make "clear and specific findings conforming to the statutory requirements, and the evidence must address conditions that exist at the time of the hearing." *S.Z.*, 547 N.W.2d at 893.

J.M. had uniquely complex medical needs, and the parental duties required to adequately care for him were therefore significantly more extensive than ordinary parental duties. But they were not so extraordinary as to be beyond the ability of a vigilant and dedicated parent with no special skills. J.M. required round-the-clock medical care, and his care-providers had to pay meticulous attention to detail and possess the ability to coordinate and communicate with a team of health professionals. The evidence at trial demonstrated that appellant repeatedly failed to fulfill the exacting demands that the circumstances necessitated. For example, despite repeated requests and a specific court order on the subject, appellant refused to take the steps to obtain a necessary therapeutic "stander" device for J.M. On at least six documented occasions, she left J.M.'s bed rails down and then walked away, a mistake that could have been fatal for him. She repeatedly failed to take advantage of essential in-home disability services, and her lack of cooperation drove the in-home PCA agency away. And, as noted above, she was unable or unwilling

to communicate with health-care providers and manage J.M.'s medical appointments.

The district court found that, although appellant made some progress, she did not possess the parenting skills required for the child's survival. As with the first statutory ground, given the extensive evidence in the record and the district court's province in making credibility determinations, substantial evidence supports its finding that appellant failed to comply with parental duties and this failure could not be remedied in the foreseeable future. The district court therefore did not abuse its discretion in concluding that termination was warranted.

## C. Neglected and in foster care

 Appellant argues that she does not fit the statutory requirements for termination where the child is neglected and in foster care. This ground applies if (1) the child has been placed in court-ordered foster care; (2) the parents' conduct precludes returning the child to them; and (3) the parents have failed to make reasonable efforts to adjust their conduct, despite the availability of needed rehabilitative services. Minn.Stat. § 260C.007, subd. 24 (2010); *see* Minn.Stat. § 260C.301, subd. 1(b)(8) (allowing termination of parental rights if child is neglected and in foster care). In applying this ground, the court must consider the length of time the child has been in foster care, the parent's efforts and participation in visitation, the agency's efforts to facilitate reunion, and whether additional services would facilitate reunion. Minn.Stat. § 260C.163, subd. 9 (2010).

The district court found that J.M. had been medically neglected and was in foster care because appellant had not been able to provide for the child's physical needs and did not demonstrate a present ability to do so. It considered the length of time that J.M. had been in foster care and his

prior out-of-home placement less than a year earlier. After being returned to appellant's care, J.M. was medically neglected and lapsed into "starvation mode." The previous attempt to return J.M. to appellant's care was thus wholly unsuccessful.

The district court also considered the services provided to reunite appellant with the child and found them to be reasonable. It found that appellant had failed to take advantage of disability services in the past, and that her lack of cooperation would frustrate further efforts to provide those services. It recognized appellant's efforts and progress, but found that given the child's needs, appellant still lacked the skills necessary to ensure that the child would not be medically neglected. As substantial evidence in the record supports these findings, the district court did not abuse its discretion in concluding that termination was warranted under this ground.

## D. Palpable unfitness

 Appellant argues that termination was not justified under the palpable-unfitness ground because (1) the county did not adduce clear and convincing evidence and (2) the district court's findings were insufficient. Parental rights may be terminated for palpable unfitness when clear and convincing evidence demonstrates "(1) a consistent pattern of specific conduct before the child or specific conditions, (2) directly relating to the parent and child relationship, (3) of a duration or nature that renders the parent unable to care appropriately for the needs of the child, (4) for the reasonably foreseeable future." *S.Z.*, 547 N.W.2d at 893; *see also* Minn. Stat. § 260C.301, subd. 1(b)(4).

The district court found that appellant demonstrated a specific and detrimental pattern of conduct in her inability to coordinate J.M.'s medical care, her failure to

follow through on medical recommendations, and her inconsistency in obtaining necessary services and care for the child. But it also found that appellant demonstrated knowledge of J.M.'s past and present medical history and that she was a staunch advocate for him. Several witnesses testified that they believed appellant loved J.M.

■■ Given appellant's efforts and undisputed love for J.M., palpable unfitness appears to be the weakest basis for termination upon which the district court relied in terminating appellant's parental rights. But we need only one properly supported statutory ground in order to affirm a termination order. *See In re Welfare of M.H.*, 595 N.W.2d 223, 227 (Minn.App. 1999) ("Only one [statutory] criterion needs to be proven to support termination.").

In any event, we cannot conclude that the district court's findings were clearly erroneous. In finding palpable unfitness, the district court properly took into account J.M.'s uniquely demanding medical needs. *Cf. In re Welfare of M.A.*, 408 N.W.2d 227, 233 (Minn.App.1987) (noting that although mother was successful in parenting one child, she did not possess skills necessary to deal with other child's special needs stemming from severe behavioral problems), *review denied* (Minn. Sept. 18, 1987); *In re Welfare of D.D.K.*, 376 N.W.2d 717, 721 (Minn.App.1985) (noting that although mother demonstrated ability to parent an average child, she did not possess ability to care for special-needs child). Undisputed evidence demonstrated that the child required a meticulous level of round-the-clock care, and appellant's love for J.M. and knowledge of his medical history were not sufficient to meet his extraordinary needs. The district court did not abuse its discretion in concluding

that termination was warranted for palpable unfitness.

**IV.**

Appellant next argues that the district court clearly erred in finding that termination was in the child's best interests. Even when statutory grounds for termination are met, the district court must separately find that termination is in the child's best interests. Minn.Stat. § 260C.301, subd. 7; *In re Tanghe*, 672 N.W.2d 623, 625–26 (Minn.App.2003). It must consider the interests of both the parent and child in preserving their relationship as well as any competing interests of the child. *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn.App.1992). Competing interests include health considerations, a stable environment, and the child's preference. *Id.* If the interests of parent and child conflict, "the interests of the child are paramount." Minn.Stat. § 260C.301, subd. 7. Because the best-interests analysis involves credibility determinations and is "generally not susceptible to an appellate court's global review of a record," we give considerable deference to the district court's findings. *Tanghe*, 672 N.W.2d at 625.

Appellant argues that her undisputed love for the child and the strong bond between them compelled a finding that termination was *not* in his best interests. A parent's bond with a child weighs in favor of reunification. *In re Welfare of A.J.C.*, 556 N.W.2d 616, 620 (Minn.App. 1996), *review denied* (Minn. Mar. 18, 1997). Nonetheless, a parent's love and desire to regain custody may not be enough. *See In re Welfare of A.D.*, 535 N.W.2d 643, 650 (Minn.1995) (concluding that mother's love for child and desire to regain custody were not sufficient where she failed to demonstrate requisite parenting skills); *A.J.C.*, 556 N.W.2d at 622 (concluding that despite

appellant's love for and bond with children, her inability to comply with parental duties due to alcoholism and drug addiction warranted termination).

Multiple witnesses, including the guardian ad litem, testified that they believed appellant loved J.M. The guardian ad litem personally observed the strong attachment between J.M. and his mother. But she also testified that J.M. responded favorably to his foster-care providers, and she observed a warm and stable relationship between J.M. and the foster-care providers. After observing J.M.'s attachment to appellant and considering his extensive needs, the guardian ad litem and Dr. Gilles both testified unequivocally that termination was in J.M.'s best interests.

The district court found that, despite appellant's love for J.M. and strong desire to preserve the parent-child relationship, the child's complex needs outweighed appellant's interests. The court found that although J.M. could not verbalize his preference, he had thrived only while in foster care. The district court carefully considered the evidence and found that appellant lacked the skills necessary to manage J.M.'s complex medical needs and provide the requisite level of care for him. The district court made detailed findings which are supported by the record, including consideration of permanency alternatives. Given the centrality of credibility in the best-interests analysis and the wealth of evidence regarding J.M.'s medical needs, we conclude that the district court did not clearly err in finding that termination was in J.M.'s best interests.

## V.

█ Appellant challenges several of the district court's evidentiary rulings at trial. The decision whether to admit or exclude evidence is discretionary with the district court. *See In re Welfare of Chil-*

*dren of J.B.,* 698 N.W.2d 160, 172 (Minn. App.2005), *review dismissed* (Minn. May 3, 2005). A district court abuses its discretion if it improperly applies the law. *Dobrin,* 569 N.W.2d at 202. A new trial may be granted on the basis of an improper evidentiary ruling only if the appellant demonstrates prejudicial error. *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 46 (Minn.1997). An evidentiary error is not prejudicial if the record contains other evidence that is sufficient to support the findings. *See In re Welfare of S.R.A.,* 527 N.W.2d 835, 838 (Minn.App.1995) (concluding that any error in admission of challenged evidence was harmless because it was cumulative to other evidence, and was therefore not prejudicial), *review denied* (Minn. Mar. 29, 1995).

### A. Opinion testimony of foster mother

█ At trial, the J.M.'s foster mother testified that, based on her observations of appellant and appellant's interactions with J.M., she had concerns about appellant's ability to provide the requisite level of care for him. Appellant argues that (1) there was insufficient foundation for the opinion testimony; (2) this opinion concerned an ultimate legal issue; and (3) the foster mother was biased against appellant.

█ The rules of evidence generally apply in juvenile protection proceedings. Minn. R. Juv. Prot. P. 3.02, subd. 1. A lay witness may testify to opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Minn. R. Evid. 701. The key question is whether "the witness personally knows what he or she is talking about and whether the testimony will be helpful to the [fact-finder]." *State v. Post,* 512 N.W.2d 99, 101 (Minn.1994). However,

witnesses may not offer bald legal conclusions. *State v. Saldana*, 324 N.W.2d 227, 230–31 (Minn.1982).

■ The district court has wide latitude in determining the adequacy of foundation for a lay witness's opinion testimony. *Holweger v. Great N. Ry.*, 269 Minn. 83, 95, 130 N.W.2d 354, 362 (1964). Here, the foundation established that the foster mother, a former nurse, had cared for J.M. for almost a year and had extensive knowledge of his medical needs. She also had personal knowledge of appellant's interactions with J.M., as well as with appellant's difficulties in coordinating care and staying in touch with service providers. The foster mother did not testify to a legal conclusion regarding whether termination of appellant's parental rights was warranted. Rather, she testified that based on her perception and knowledge, she had concerns about appellant's ability to properly care for the child. *Cf. Larson v. Anderson, Taunton & Walsh, Inc.*, 379 N.W.2d 615, 619 (Minn.App.1985) (concluding that eyewitnesses did not testify to a legal conclusion when they stated, based on their personal experience, that a driver could not have avoided accident), *review denied* (Minn. Mar. 14, 1986). The district court expressly found that the foster mother's testimony was helpful to the determination of a fact in issue. Furthermore, the district court is permitted to consider recommendations of a foster parent when deciding whether to terminate parental rights. Minn.Stat. § 260C.193, subd. 2 (2010); *see also* Minn. R. Juv. Prot. P. 3.02, subd. 1 (stating that the rules of evidence apply "[e]xcept as otherwise provided by statute"). Accordingly, the district court did not abuse its discretion in admitting the testimony.

Appellant's allegations of bias concern the foster mother's credibility. The district court acted well within its province in finding the foster mother's testimony credible. *See L.A.F.*, 554 N.W.2d at 396 (stating that appellate courts defer to district courts' findings on credibility).

## B. Exhibit 26 (letter from Dr. Gilles)

■ Appellant next challenges a letter from Dr. Gilles that was admitted over her objection. The letter is dated January 28, 2011, a few days before the termination petition was filed. It recommends terminating appellant's parental rights due to her inability to properly care for J.M. Appellant argues that (1) the letter constitutes hearsay that does not fall under the business-records exception and (2) it contains secondary hearsay.

■ Hearsay statements are generally inadmissible unless they fall within a designated exception. Minn. R. Evid. 802. The business-records exception permits admission of records containing hearsay if they are (1) kept in the course of a regularly conducted business activity and (2) supported by proper foundation. Minn. R. Evid. 803(6). However, records prepared in anticipation of litigation are not admissible as business records. *Id.* But even if this letter was prepared in anticipation of litigation, appellant's arguments fail for two reasons. First, any error was harmless because Dr. Gilles testified at trial regarding her opinion and was subject to cross-examination. *See Wagner v. Thomas J. Obert Enters.*, 396 N.W.2d 223, 228 (Minn.1986) (holding that erroneous admission of hearsay medical notes was harmless error when doctor testified and was subject to cross-examination). Second, any error was harmless because the court made detailed findings based on Dr. Gilles's *testimony* rather than the letter, and there was sufficient other evidence in the record to support the district court's findings. *Cf. S.R.A.*, 527 N.W.2d at 838 (concluding that any error in admitting a

letter from child's therapist was not prejudicial because it was cumulative to other evidence).

### C. Exhibit 28 (certified police reports and photographs)

Appellant challenges the admission of certified copies of police reports and photographs from the neglect incident that led to the first CHIPS petition in 2009. She argues that (1) the reports were not relevant because the prior incident was not pleaded in the termination petition; (2) the reports constitute inadmissible hearsay; and (3) the photographs were more prejudicial than probative.

■ Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Minn. R. Evid. 401. Although the first CHIPS petition was not pleaded as a basis for the termination petition, the district court took judicial notice of all court records relating to the first CHIPS petition, and appellant did not object. The neglect incident was relevant to whether appellant demonstrated a pattern of failing to comply with the duties of parenthood, including providing a safe and clean environment for the child. It was also relevant to projecting appellant's future ability to provide a safe environment and suitable level of care for the child.

■ Appellant's hearsay argument is also unavailing. The reports were admissible under the public-records hearsay exception. *Cf. Gardner v. Comm'r of Pub. Safety*, 423 N.W.2d 110, 114 (Minn.App. 1988) (holding that trial court did not abuse its discretion by admitting police reports in civil case under public-records exception); *see generally* Minn. R. Evid. 803(8) (establishing public-records exception).

As to appellant's unfair-prejudice argument, the district court may exclude evidence if its probative value is substantially outweighed by the danger of *unfair* prejudice. Minn. R. Evid. 403. Unfair prejudice means an "unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Buggs*, 581 N.W.2d 329, 336 (Minn.1998) (quotation omitted). Photographs may be unduly prejudicial if they are excessively explicit, inflammatory, or graphic. *Id.* at 336–37.

■ The photographs in this case depict the unsanitary conditions in which J.M. was discovered when the first CHIPS petition was filed. The environment and conditions in which J.M. was living while in appellant's care were of central importance at trial. The photographs do not constitute illegitimate means to gain an unfair advantage, especially because this was a bench trial and not a jury trial. *Cf. State v. Townsend*, 546 N.W.2d 292, 296 (Minn. 1996) (noting that admission of explicit photographs was unfairly prejudicial because they inflamed the jury). The district court deemed the photographs probative. It did not abuse its discretion in admitting them.

### D. Exhibit 18 (hospital records)

■ Appellant challenges the admission of J.M.'s pre-operative medical records from the Children's Hospital of Minnesota. She argues that the records constitute hearsay and that the county did not lay sufficient foundation to qualify them as business records.

■ To lay the foundation for the business-records hearsay exception, a qualified witness must testify that the records were kept in the course of a regularly-conducted business activity, and that it was the normal practice of that business to keep such records. *Nat'l Tea Co. v. Tyler Refrigera-*

*tion Co.,* 339 N.W.2d 59, 61 (Minn.1983). The witness must be familiar with how the records are kept. *Id.* at 61–62.

Dr. Gilles testified that she was familiar with the records of the particular children's hospital at which the records were kept. She testified that the records were made and kept in the normal course of business at the hospital. This substantially conforms to the foundational requirements. As the district court has wide latitude in determining the adequacy of foundation, it did not abuse its discretion in admitting the records. Additionally, any error in admitting the records was harmless because the district court did not rely on the exhibit in its findings and there was substantial other evidence in the record to support the findings.

### E. Exhibit 19 (e-mail from foster mother to child-protection social workers)

■■■ Appellant challenges the admission of an e-mail from J.M.'s foster mother to his caseworkers in which the foster mother requests that the county supervise appellant during the child's medical appointments. Appellant argues that the e-mail was inadmissible because its contents were based on hearsay. Appellant concedes that she did not object to the e-mail at trial, but argues that she preserved the error by raising it in her post-trial motion for a new trial.

Contrary to appellant's argument, our caselaw establishes that when "allegedly improper or prejudicial evidence has been admitted without objection, a party may not object to its admissibility for the first time *in a motion for a new trial* or on appeal." *State v. Folkert,* 354 N.W.2d 583, 584 (Minn.App.1984) (emphasis added) (quotation omitted). Appellant's reliance on two cases that purportedly hold otherwise is misplaced. In *Elwell v. Cnty. of*

*Hennepin,* the issue was whether the trial court had sufficient opportunity to consider a *constitutional issue,* not an evidentiary ruling. 301 Minn. 63, 68, 221 N.W.2d 538, 542 (1974). On appeal, the court concluded that the parties had preserved the issue because they fully briefed it below and the trial court discussed it at length. *Id.* Likewise, *Kitchar v. Kitchar* is inapposite because it involved evidence that was not discovered until after trial. 553 N.W.2d 97, 100 (Minn.App.1996), *review denied* (Minn. Oct. 29, 1996).

Because appellant failed to object to exhibit 19 at trial, she has waived review of it on appeal. *See In re Welfare of T.D.,* 731 N.W.2d 548, 553 (Minn.App.2007) (holding that parent waived appellate review of evidentiary ruling by failing to object until post-trial motion). In any event, any error regarding its admission would be harmless because the district court did not rely on the exhibit, and sufficient other evidence supported its findings.

### F. Exhibit 33 (foster parents' list of attempts to contact appellant)

■■■ Appellant argues that exhibit 33, a list of the foster parents' unsuccessful attempts to contact appellant, was inadmissible because it was cumulative to other evidence. Specifically, she argues that the list was duplicative of exhibit 9. The district court admitted the exhibit as a summary and for illustrative purposes only.

Evidence may be excluded if it is needlessly cumulative or causes undue delay. Minn. R. Evid. 403. Exhibit 9 is a lengthy log documenting all of the contacts and attempted contacts between the foster parents and appellant. Exhibit 33 summarizes the occasions on which the foster parents could not reach appellant. This information was relevant to the court's finding that appellant demonstrated a pattern of insufficient communication and or-

ganizational skills. Although the information is also contained in exhibit 9, the extraction of relevant excerpts was helpful to the court. *See* Minn. R. Evid. 1006 (allowing admission of summaries of voluminous exhibits). In any event, because appellant did not challenge exhibit 9, any error regarding exhibit 33 would be harmless. *See T.D.*, 731 N.W.2d at 553 (stating that failure to object to evidence at trial results in waiver of appellate review); *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 172 (Minn.App.2005) (noting that erroneous admission of evidence which is cumulative to other admissible evidence is harmless). The district court did not abuse its discretion in admitting the challenged evidence.

In sum, we conclude that appellant's evidentiary challenges are without merit. Even apart from the challenged evidence, substantial independent and undisputedly admissible evidence supported the district court's findings. And, because this was a bench trial, any prejudice stemming from any erroneously admitted evidence would be minimal. *See State v. Burrell*, 772 N.W.2d 459, 467 (Minn.2009) (recognizing that risk of unfair prejudice is diminished in bench trial); *S.R.A.*, 527 N.W.2d at 838 (recognizing that erroneous admission of evidence is not prejudicial if it is cumulative to other evidence). Appellant has not met her burden in showing that the district court abused its discretion or that admission of any of the challenged evidence resulted in prejudice.

## DECISION

Despite the death of the child pending his mother's appeal from an order terminating her parental rights, the perfected appeal requires that we review the termination order in light of the facts in existence at the time it was entered. The district court did not err in concluding that

termination of appellant's parental rights was justified under four statutory grounds, and the court did not abuse its discretion in admitting the challenged evidence.

**Affirmed.**