*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1103**
**A23-1125**

In the Matter of the Welfare of the Children of:
R. V. M. and J. R. M., Parents.

**Filed February 5, 2024**
**Affirmed**
**Cleary, Judge***

Blue Earth County District Court
File No. 07-JV-23-1251

Steven D. Winkler, Brandt & Winkler, P.A., St. Peter, Minnesota (for appellant-father
J.R.M.)

Patrick R. McDermott, Blue Earth County Attorney, Susan B. DeVos, Assistant County
Attorney (for respondent county)

Kenneth R. White, Law Office of Kenneth R., White, P.C., Mankato, Minnesota (for
appellant-mother R.V.M.)

Kaylee Polzin, Lisa Hopkins, St. Peter, Minnesota (guardians ad litem)

      Considered and decided by Bratvold, Presiding Judge; Smith, Tracy M., Judge; and

Cleary, Judge..

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

**CLEARY**, Judge

In this consolidated appeal, appellant-parents challenge the termination of their parental rights to their two children, arguing that the record does not support the district court's determinations that one of their children experienced egregious harm while in their care, that termination of their parental rights is in their children's best interests, and that respondent-county provided reasonable services to pursue reunification of the family. We affirm.

## FACTS

Appellant-father J.R.M. (J.) and appellant-mother R.V.M. (R.) were married in 2019. Their daughter A., now three years old, was born in September 2020. A mandated reporter notified respondent Blue Earth County (the county) of bruises on A.'s face in March 2021, when she was approximately six months old. Their son C., now one year old, was born in September 2022.

In January 2023, R. told C.'s doctor that he had been bitten on the cheek by A. and was sometimes irritable; R. also said she was pregnant. Later that month, R. took C., to urgent care, but left with him before they were seen. In February, R. was taken to the hospital and the children remained at home. When she returned home, she saw bruises on C. but did not take him in for medical care because she believed the bruises were caused by A. punching and biting him and because she was not concerned about the bruises since C. did not seem to be in pain.

A few days later, a caregiver noticed bruises on C. and notified law enforcement. One of the detectives who responded to the caregiver's call noted that C. was warm and seemed to be running a fever. When the detective interviewed R., she attempted to show that she could not have caused the bruising on him because her fingers and knuckles were not small enough. The detective did not feel that C. was in immediate danger and did not place him on a hold. R. later testified that she did not take C. to the hospital because, in her eyes, she had proved to the detectives that she had not caused the bruising; also, she was irritated that the caregiver had contacted the police rather than contacting R.

On February 23, R. took C. to urgent care because he had been projectile vomiting. He was diagnosed with an ear infection. Later that afternoon, R. took C. to the emergency room where the doctor noted that he looked malnourished, had lost weight, and had two fractured ribs as well as a fractured femur that was now healing. An x-ray revealed that C. had an intussusception, or fold in the intestine, and he and R. were taken to the Mayo Clinic in Rochester.

Several medical professionals examined C. at Mayo. A radiologist discovered old fractures; another doctor expressed concern over the multiple fractures in a nonambulatory patient and said that he had a mandating responsibility; a pediatric abuse specialist provided a list of measures to evaluate C.'s bone formation; another doctor learned of potential skull fractures on C.'s head and asked that C. return to the hospital for a nonaccidental trauma workup. A CT exam of C.'s head revealed fractures.

A county social worker and a detective received a report about the physical abuse of C. from Mayo and went to appellants' home. R.'s 15-year-old brother was watching A.;

3

J. was sleeping and difficult to awaken. When J. was asked about C.'s injuries, he had no explanation for them, and he made no inquiries about C. A., dirty and covered in syrup, was removed from the home.

When the social worker and the detective told R. that the children were being removed from their parents' home, she responded with obscenities, saying she had "already had two f-cking cop calls about f-cking me abusing my kids" and that "you don't wanna f-cking mark on your kid. This is why I'm literally such an overcautious f-cking parent." R. also said that the fact that C.'s injuries "happened some time ago pisses me off," and she identified herself, J., her mother, and J.'s mother as the children's caregivers. The children were placed in foster care, where they have now been for almost a year.

On February 27, 2023, the county filed a "Children in Need of Protection of Services" (CHIPS) petition on A. and C. R. and J. were interviewed; neither of them could identify anyone who might have caused C.'s injuries. On March 1, a doctor who reviewed C.'s MRI scans found three skull fractures, a bruise on his brain, and some blood products; the doctor said that the case was highly concerning for abuse and indicated C.'s "clear and significant history of trauma."

R. was interviewed again on March 2 during the Emergency Protection Care Hearing in the CHIPS file. She said she got frustrated with the children and offered various explanations for C.'s injuries, including bumping his head on a door frame; she also suggested that if she did cause C.'s injuries, "it was a complete accident." She explained that, although she usually put C. down gently, one time she was "a little bit more angry," and "was like, you know what, you can lay in your swing, you're gonna cry it out tonight."

4

At the admit/deny hearing in the CHIPS file on March 3, both appellants denied all the allegations in the CHIPS petition. When J. was interviewed, he said that R.'s parents and his mother watched the children almost every week so that he and R. could have time together and that the only things relative to C.'s injuries that he knew from R. were when she "bonked [C.'s] head on the doorframe and when she would squeeze him," "I mean if she's shaking him and holding him and trying to calm him down."

In April 2023, the county filed a petition for the termination of appellants' parental rights. A social worker reported that both children were doing well in foster care, but that there was some concern with A.'s speech and her social interactions. At the admit/deny hearing on the petition, appellants again denied all the allegations. Based on C.'s injuries, the county asked to be relieved of efforts to reunify the family. The district court denied the request and ordered the county to continue to work with appellants. Within a week, the county began supervised visitation for appellants and the children, which the district court considered "a clear and concerted effort to comply" with its order. The district court also said that the matter would depend on how the supervised visits went.

Following a four-day trial in May and June, the district court issued a 116-page order that terminated appellants' parental rights to A. and C. based on three separate statutory grounds. R. filed a notice of appeal (A23-1103) on July 28; J. filed a notice of appeal (A23-1125) on August 1. This court consolidated the appeals. Appellants challenge the grounds for termination and the district court's conclusions that the termination was in the children's best interests and that the county's efforts to reunify the family were reasonable under the circumstances.

5

**DECISION**

Appellate courts "affirm the district court's termination of parental rights when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, provided that the county has made reasonable efforts to reunite the family." *In re Welfare of Child of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008) (citation omitted). On appeal, "[c]onsiderable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996). Appellate courts "apply an abuse-of-discretion standard of review to a district court's conclusion that termination of parental rights is in a child's best interests." *In re Welfare of Child of A.M.C.*, 920 N.W.2d 648, 651 (Minn. App. 2018). "Determination of a child's best interests is generally not susceptible to an appellate court's global review of a record," and "an appellate court's combing through the record to determine best interests is inappropriate because it involves credibility determinations." *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn. App. 2009) (citation and quotations omitted).

1.    **Statutory Ground**

Only one properly supported statutory ground is necessary to support a termination. *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 92 (Minn. App. 2012). We affirm on the ground that, while in appellants' care, C. suffered egregious harm as defined by Minn. Stat.

6

§ 260C.007, subd. 14 (2022), that was identified as a basis of termination by Minn. Stat. § 260C.301, subd. 1(b)(6) (2022).[1]

Termination of parental rights because of egregious harm suffered by a child while in the parent's care requires harm of a "nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care." Minn. Stat § 260C.301, subd. 1(b)(6). Egregious harm is defined as "the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn. Stat. § 260C.007, subd. 14. It includes substantial bodily harm as defined in Minn. Stat. § 609.02, subd. 7a (2022). *Id.*, subd. 14(2). Substantial bodily injury is defined as an "injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member." Minn. Stat. § 609.02, subd. 7a. The requirement is that the child experience the harm, not that the parent inflict it; being "in the parents' care" requires only that the parent knew or should have known that the child experienced the harm, not that the parent inflicted the harm. *In re Welfare of Child of T.P.*, 747 N.W.2d 356, 362 (Minn. 2008).

---

[1] The district court also gave as grounds for termination appellants' failure to comply with the duties imposed by the parent-child relationship, set out as a basis for termination in Minn. Stat. § 260C.301, subd. 1(b)(2) (2022), and their palpable unfitness to be a party to the parent-child relationship, set out in Minn. Stat. § 260C.301, subd. 1(b)(4) (2022). Although we agree with these determinations, we do not address them, because only one statutory ground is necessary to support termination. *See J.K.T.*, 814 N.W.2d at 92.

Three physicians testified that during a four-month period, C. suffered a femur fracture, two rib fractures, and three skull fractures, any one of which was substantial bodily harm, as well as a brain bruise. These injuries would have caused pain, and they indicated nonaccidental trauma, not a medical condition. The bruises on C.'s face, behind his ear, and on his back in February 2023, also indicated nonaccidental trauma. A. also had a bruise on her face when she was about six months old, although neither appellant remembered it. C.'s failure to gain weight and his actual weight loss in a month would have been noticeable, although R. did not notice it, and it caused C. to be diagnosed with a failure to thrive. C.'s intussusception was not the cause of the weight loss.

Two doctors testified that the fractures would not have occurred during the normal care of C., that C. would have shown pain when the fractured areas were manipulated, and that C. would have tried to protect his injured leg. C.'s paternal grandmother testified that she had told appellants of her concern regarding injuries to C.'s torso and leg and his failure to gain weight. While J. agreed that his mother had told him these things, R. at first denied it, but the district court noted that R.'s story as to when she first knew of C.'s injuries changed "throughout her testimony." Neither parent noticed C.'s bruises. R. attributed C.'s injuries to A., to colic, or to digestive problems. She testified that she brought C. to the emergency room after he didn't eat for six hours, was told to follow up for suspected intussusception, did not follow up, did not notice C.'s failure to gain weight, did not inform the doctor of her concern about colic, and let C. vomit for one or two days before seeking medical attention for him.

8

Neither appellant dispute that C. had the injuries and conditions to which the doctors testified; rather they argue that they did not know and should not have known about them. J. testified consistently that he did not know about C.'s medical problems; the district court found that J. knew or should have known of the egregious harm but did not recognize it because he was not involved with C. J.'s argument that he did not learn until the trial in May and June that C.'s "weight had gone from around the fiftieth percentile in January to the second percentile in February" supports the district court's determination that J. was not involved with C., not J.'s view that C. therefore did not suffer egregious harm. Moreover, J. also testified that his mother had told him about her concerns as to C.'s condition, but J. did not act on them.

The district court determined that R., as C.'s primary caretaker, knew or should have known that C. suffered egregious harm. R. argues that neither C.'s weight loss nor his bruises would independently have supported termination, but that is not the issue. The issue is whether C., while in appellants' care, had experienced harm to such an extent that any reasonable person would believe it contrary to his best interest to remain in their care. R. concedes that "the fractures are a major concern," but argues that she did not know C. had suffered them. But others, among them J.'s mother and an unrelated caregiver, testified that they had told R. about the bruises and expressed concern that C. was not doing well. No reasonable person could think it in C.'s best interest to remain in the care of someone, or two people, who failed to perceive his frequent and serious injuries and who put him into situations where he could be harmed. As such, the termination due to egregious harm suffered by C. while in the care of appellants was not an abuse of discretion.

9

## 2. The Children's Best Interests

Appellate courts "affirm the district court's termination of parental rights when at least one statutory ground for termination is supported by clear and convincing evidence and *termination is in the best interests of the child*, provided that the county has made reasonable efforts to reunite the family." *S.E.P.*, 744 N.W.2d at 385 (emphasis added) (citation omitted). There is no dispute that the interests of the children, not that of the parents, predominate in termination matters. *See* Minn. Stat. § 260C.301, subd. 7 (2022) (stating that, in termination proceedings, "the best interests of the child must be the paramount consideration" and "[w]here the interests of parent and child conflict, the interests of the child are paramount"); *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012) ("stating that the district court must balance the preservation of the parent-child relationship against any competing interests of the child, including such things as a stable environment, health considerations and the child's preferences" and a parent's "love and desire" to care for children "does not outweigh [the] children's needs for basic care and adequate nutrition"). "Safety" and "freedom from abuse" are also among children's needs.

The district court noted that, in this case, "it was clear that [the] [c]hildren's family loves them very much," but also cited *J.K.T.*, 814 N.W.2d at 92, which held that, while a parent's bond with a child weighs in favor of reunification, a parent's love and desire to regain custody may not be enough. At the time of trial, A. and C. were too young to express their preferences. But they needed a stable environment, *see K.S.F.*, 823 N.W.2d at 668, and appellants testified that they were unable to provide this; appellants had difficulty with

10

getting the children to eat and to sleep, and with caring for both of them at once. The children therefore spent a good deal of time with their grandmothers, outside their home, and the district court noted that "[appellants'] ability to care and provide for [c]hildren [is] not likely to improve with the addition of a third child, as testified to by various professionals." The district court noted that a child-abuse expert "expressed grave concerns in returning [the c]hildren to [appellants'] care," and that the district court itself shared those concerns. This supported the district court's conclusion that "the competing interest of the [c]hildren's health, safety, and stability outweigh" the children's and appellants' interest in maintaining their relationship. Termination of appellants' parental rights is in their children's best interest.

### 3. The County's Reunification Efforts

Appellate courts "affirm the district court's termination of parental rights when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, *provided that the county has made reasonable efforts to reunite the family*." *S.E.P.*, 744 N.W.2d at 385 (emphasis added) (citation omitted). In granting a termination of parental rights petition, a district court must "make findings and conclusions as to the provision of reasonable efforts" by the county. Minn. Stat. § 260.012(h) (2022). "[W]hat constitutes 'reasonable efforts' depends on the facts of each case." *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 601 (Minn. App. 2021), *rev. denied* (Minn. Dec. 6, 2021.).

Both appellants argue that the county's failure to prepare a case plan entitles them to reversal of the termination. But lack of a case plan is not dispositive in termination

11

cases. *See, e.g.*, *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 56 (Minn. 2004). "Rather failure to provide [a written case plan] does not automatically warrant reversal if the circumstances render the lack of a case plan excusable." *In re Welfare of Children of A.R.B.*, 906 N.W.2d 894, 898 (Minn. App. 2018). Here, the primary concern at the time the children were placed in foster care was ensuring their safety and eliminating any opportunity for further abuse, which required identifying the abuser.

Both appellants were among the six possible abusers, the others being three of the children's grandparents and their uncle, and appellants had frequently left the children in their care. As the district court observed, none of these six people "ha[s] taken responsibility for [C.'s] injuries and multiple fractures" and, because the abuser had not been identified, "limiting [appellants'] contact [with the children] to supervised parenting time in the controlled environment of the government center was the best way to maintain [the children's] safety and was reasonable given the circumstances of this case." Unless and until the abuser could be identified, returning the children to the situation in which the abuse had occurred would not have been reasonable.

The district court said it "would have preferred the [c]ounty . . . provide more services, such as a parenting assessment, a therapy referral for [J.], and/or parenting classes," but added that it could not say that "the [c]ounty's efforts were not reasonable given the circumstances of this case." Appellants are not entitled to reversal because the county limited its reunification efforts to supervised visitation that would maintain their relationship with the children.

12

The district court did not abuse its discretion in terminating appellants' parental rights.

**Affirmed.**