*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0199**

In the Matter of the Welfare of the Children of:
A. S. and T. S., Parents

**Filed July 20, 2015**
**Affirmed**
**Hooten, Judge**

Otter Tail County District Court
File Nos. 56-JV-14-1820, 56-JV-13-2003

Christopher J. Cadem, Cadem Law Group, PLLC, Fergus Falls, Minnesota (for appellant A.S.)

David J. Hauser, Otter Tail County Attorney, Kurt A. Mortenson, Assistant County Attorney, Fergus Falls, Minnesota (for respondent Otter Tail County Department of Human Services)

Deanne Raitz, Fergus Falls, Minnesota (Guardian ad Litem)

Considered and decided by Reilly, Presiding Judge; Halbrooks, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Appellant-mother argues that the record does not support the district court's termination of her parental rights and its determination that reasonable efforts had failed to correct the conditions leading to her children's out-of-home placement. We affirm.

# FACTS

On July 22, 2013, D.R.S. was born to appellant-mother A.S. and father T.S.[1] At the time of his birth, D.R.S. tested positive for amphetamine, opiates, marijuana, and methamphetamine. As a result, D.R.S. was placed in foster care on July 27. On July 29, respondent Otter Tail County Department of Human Services (the county) filed a child in need of protection or services (CHIPS) petition, seeking to adjudicate D.R.S. and his two siblings, J.R.S., and A.W.S., who were 2 and 3 years old at the time, as children in need of protection or services. The petition alleged that the children were "without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of the child's parent." An emergency protective care hearing was held on July 30, at which time the district court allowed A.S. to retain care, custody, and control of J.R.S. and A.W.S., subject to the supervision of the county, under the condition that A.S. abstain from using alcohol and controlled substances and that she continue living with her friend. The district court granted the county the custody, care, and control of D.R.S., who remained in foster care. The district court appointed a guardian ad litem (GAL) for all three children.

On August 5, the county filed an ex-parte motion for the immediate custody of J.R.S. and A.W.S. because A.S. had left the home of her friend. J.R.S. and A.W.S. were then placed into foster care. At that time, J.R.S. had 16 cavities and needed to undergo

---

[1] T.S., along with A.S., was served with the termination of parental rights petition, but T.S. did not participate in the proceedings that are the subject of this appeal. Although T.S.'s parental rights were also terminated by the district court's order, T.S. did not appeal from the order.

dental surgery. A case manager was assigned to this case, who worked closely with A.S. throughout these proceedings. Another emergency protective care hearing was held on August 7, and the district court ordered J.R.S. and A.W.S. to remain in foster care, along with D.R.S.

On August 12, A.S. had supervised parenting time with her children, but she refused to provide a urine sample. As a result of a rule 25 chemical-use assessment, A.S. was diagnosed as chemically dependent, and it was recommended that she obtain inpatient chemical-dependency treatment. The county assigned A.S. a primary chemical-dependency counselor, who worked with A.S. throughout these proceedings.

An admit/deny hearing was held on August 16. A.S. admitted that her three children were in need of protection or services because they were without proper parental care due to her emotional, mental, or physical disability or state of immaturity. She also admitted that her chemical dependency affected her ability to appropriately parent her children and agreed that she needed inpatient chemical-dependency treatment. In an August 20 order, the district court adjudicated all three children as children in need of protection or services.

The county then completed an out-of-home placement plan for each child, with start dates of August 26, 2013. A.S. and her case manager met to discuss the case plans as well as inpatient treatment. The case manager arranged for parenting time between A.S. and her children. At a dispositional hearing on September 18, A.S. agreed to the services and requirements of the case plans, which required A.S. to accomplish or demonstrate the following in order to regain care, custody, and control of her children:

3

1. Follow the recommendations of her rule 25 assessment, including:
   a. enrolling in and successfully completing a residential chemical-dependency treatment program as soon as possible and following any aftercare recommendations;
   b. attending two AA/NA meetings per week;
   c. avoiding establishments that primarily serve alcohol and environments where alcohol or drugs are being used.
2. Remain sober and free of any non-prescribed drugs or alcohol.
3. Comply with random urinalysis testing.
4. Complete a parental-capacity evaluation following completion of inpatient treatment and follow all recommendations.
5. Obtain stable, suitable housing upon discharge from residential treatment.
6. Meet with her family resource worker weekly to enhance her knowledge of parenting, organization, and other identified need areas.

The intent of the case plans was to ensure the safety, permanency, and wellbeing of the children. The ultimate goal of the plans was to reunite A.S. with her children.

On August 29, A.S. began inpatient chemical-dependency treatment at Stepping Stones, a treatment program designed for women with minor children. A.S. provided a urinalysis sample prior to entering the program, which tested positive for methamphetamine and THC. While receiving treatment at Stepping Stones, A.S. worked with a social worker and attended approximately 20 hours per week of programming.

In late September and early October 2013, a child psychologist evaluated J.R.S. and A.W.S. J.R.S. and A.W.S. were then placed with A.S. at Stepping Stones under the terms of a trial home visit, and the child psychologist observed two of these visits. The child psychologist made several recommendations upon completing the evaluations. Notably, the child psychologist recommended that, in order to best meet her children's

needs, A.S. would "need to continue in her sobriety with intensive, structured support such as her present situation."

On October 9, A.S. first met with her family resource worker. The role of the family resource worker was "to model appropriate parenting and to supervise parenting time between [A.S.] and the children," which included helping A.S. establish routines and structure with her children. The family resource worker's initial recommendations included that it was "of utmost importance for [A.S.] to remain sober so she can move forward with her goal of being together with her children after leaving Stepping Stones."

On October 25, D.R.S. joined his siblings for a trial home visit at Stepping Stones. On November 7, A.S. was admitted to the emergency room and was prescribed Vicodin, which she took, contrary to the rules at Stepping Stone. Later that day, A.S. contacted her family resource worker and told her that she was going to leave Stepping Stones and that she needed someone to pick up her three children. A.S. understood that, by leaving the program early, her children would return to foster care. Her case manager came to pick up the children, who were then placed in foster care. A.S. was unsuccessfully discharged from Stepping Stones on November 7 for failing to complete the program. The discharge summary stated that A.S. "has not demonstrated an ability or willingness to be honest. . . . [A]t the core of her behaviors and continued manipulations seem to be wanting what she wants when she wants it at whatever cost." Her prognosis was described as "very poor." Stepping Stones recommended that she enter another treatment program without her children.

On November 13, A.S. told her case manager that she had recently used methamphetamine and that she wanted to get back into treatment immediately. Her case manager arranged for A.S. to begin inpatient chemical-dependency treatment at Sharehouse later that day. A.S. received treatment and was eventually discharged from the "high" and "medium" intensity treatment programs at Sharehouse and transitioned into its outpatient treatment program. Because she did not have housing, however, she remained at Sharehouse as an inpatient resident.

At Sharehouse, A.S. had supervised parenting time with her children once or twice each week. During this time period, A.S.'s lack of housing became a high priority for the successful reunification of her and her children. The family resource worker testified that while A.S. was at Sharehouse, she had the ability to parent, but required more support to take care of her children. The family resource worker also testified that, while A.S. could demonstrate appropriate parenting of the children during supervised parenting time, A.S. became overwhelmed with parenting when not in a structured support setting. She also testified that she was concerned with A.S.'s ability to remain sober when challenged by the demands of child care.

In December 2013, A.S. obtained employment at a hotel. Her case manager helped her manage her money. In an effort to obtain housing, A.S. began to save money to pay for background checks and application fees, but she ended up using this money for other purposes. Throughout the fall and winter of 2013–14, A.S.'s case manager made efforts to contact A.S.'s relatives in Oregon for family placement options, but these efforts were ultimately unsuccessful.

6

A.S. was unsuccessfully discharged from Sharehouse on January 13, 2014. In A.S.'s discharge summary, her chemical-dependency counselor noted that A.S. had missed several group sessions because of work and was unwilling to prioritize her treatment. Her counselor opined that the main reason A.S. wanted to leave Sharehouse was "to get away from the consequences of her actions."

On January 15, A.S. entered the inpatient chemical-dependency treatment program at Red River Recovery Center (Red River), where she resided for the next six months. She continued to work at the hotel and continued looking for housing with the help of her family resource worker. A.S. had difficulty finding housing because of a lack of housing in the area, her criminal background, and her inability to pay application fees. The county completed a new out-of-home placement plan for each child, with start dates of January 31, 2014, which contained the same requirements as the prior case plans.

In February 2014, a licensed psychologist completed a parental-capacity evaluation of A.S. During the evaluation, A.S. acknowledged that she was addicted to methamphetamine and marijuana. In the psychologist's opinion, A.S.'s inability to abstain from chemicals was the greatest threat to her ability to effectively parent her children. The psychologist made several recommendations based on the evaluation, including that A.S. abstain from all mood-altering chemicals and that she complete care at Red River and follow all recommendations.

In March 2014, A.S.'s case manager and family resource worker continued to assist A.S. in her housing search. In April, Red River staff observed A.S. biting or chewing a prescribed medication, which was considered to be a drug-using episode. A.S.

7

was given a relapse contract, which she did not violate in her remaining time at Red River. In late April, A.S. and her case manager discussed permanency timelines and the children's need for permanency. At the end of May, Red River staff told the case manager that A.S. was starting to "regress" in treatment and would be discharged within a week. While A.S. resided at Red River, all of her urinalysis samples were negative.

A.S. was successfully discharged from Red River on June 6, at which time several recommendations were made, including that A.S. remain chemical free, follow all of the county's recommendations, and secure housing for herself and her children. Her chemical-dependency counselor at Red River testified that, at the time of her discharge, A.S.'s homeless status was her highest risk factor for relapsing. The counselor also testified that increased stress would result in an increased likelihood of relapse, and not having stable housing could cause additional stress.

In mid-June 2014, A.S. moved in with a friend. A.S.'s case manager continued to help A.S. with housing and budgeting. On July 1, the county petitioned the district court for termination of A.S.'s parental rights (TPR). By that date, D.R.S. had been in out-of-home placement for 341 days, and J.R.S. and A.W.S. had been in out-of-home placement for 331 days.

On July 24, A.S. submitted a urinalysis sample that tested positive for alcohol. In July and August, A.S. was incarcerated in multiple counties for outstanding warrants. Her social worker arranged for supervised parenting time when A.S. was incarcerated near her children. In mid-to-late September 2014, an apartment that A.S.'s case manager had helped her obtain became available in Fergus Falls near her children. But, A.S.

8

remained in International Falls and had no transportation, so she was unable to have parenting time. On September 25, A.S. admitted to her case manager that she had recently used methamphetamine. Her case manager "discussed with [A.S.] the effect of her continued use of drugs and the resulting consequences of delayed reunification of the children with her." On September 26, A.S. underwent another rule 25 assessment. The assessor recommended that A.S. enter and complete outpatient chemical-dependency treatment as soon as possible and stated that A.S. "display[ed] verbal compliance but lack[ed] consistent efforts" with her sobriety

On October 7, A.S. submitted another urine sample that tested positive for alcohol. On October 8, A.S. entered the outpatient chemical-dependency treatment program at CARE. On October 14, A.S. submitted a urine sample that tested positive for amphetamine and methamphetamine. On November 12, A.S. met with her case manager to discuss permanency and A.S.'s recent cancellation of parenting-time visits. A.S. refused to provide a urine sample during this meeting. On December 2, A.S. was unsuccessfully discharged from CARE because of her failure to abstain from alcohol and drugs, as well as her failure to attend meetings. Around the same time period, A.S. entered the inpatient chemical-dependency treatment program at Anchorage, which she participated in for a few weeks. While there, she left the facility twice against the advice of staff. A.S. did not successfully complete treatment at Anchorage. On December 10, the county amended the TPR petition to add additional statutory grounds for termination of A.S.'s parental rights.

The district court held a two-day trial in December 2014 to adjudicate A.S.'s parental rights. During a break from the first day of trial, A.S. provided her case manager with a urine sample, but the sample was cool and diluted. During the second day of trial, A.S. refused to provide a urine sample. By the second day of trial, D.R.S. had been in out-of-home placement for 509 days, and J.R.S. and A.W.S. had been in out-of-home placement for 499 days. After hearing testimony as to the above facts and considering closing arguments of the parties, the district court concluded that the county had proven by clear and convincing evidence that A.S.'s parental rights should be terminated on two different statutory grounds, that this decision was in the best interests of the children, and that the county had made reasonable efforts to reunite A.S. with her children. This appeal followed.

## D E C I S I O N

A.S. argues that the record lacks clear and convincing evidence to support the termination of her parental rights under the statute. Courts presume that natural parents are fit to care for their children, and parental rights may be terminated only for "grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (quotation omitted). The petitioning county bears the burden of proving statutory grounds for termination by clear and convincing evidence. *Id.* Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). "[O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying . . . facts for clear error, but we review its determination of whether a particular statutory

basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see* Minn. Stat. § 260C.301, subd. 1(b) (2014) (listing statutory bases for terminating parental rights). We will affirm the district court's decision if any of the statutory grounds for termination are supported by clear and convincing evidence and termination of parental rights is in the child's best interests. *In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). We grant the district court's decision considerable deference because the district court is in a superior position to assess the credibility of witnesses. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

The district court found clear and convincing evidence in support of two statutory bases for terminating A.S.'s parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (5). A.S. asserts that neither of these two bases was sufficiently supported by clear and convincing evidence. We will address termination only under section 260C.301, subdivision 1(b)(2), because only one statutory ground must be supported by clear and convincing evidence in order for us to affirm. *See T.R.*, 750 N.W.2d at 661.

Under section 260C.301, subdivision 1(b)(2), parental rights may be terminated if

> the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and either reasonable efforts by the social services agency have failed to correct the conditions that formed the

11

basis of the petition or reasonable efforts would be futile and therefore unreasonable.

In analyzing this statutory ground, the district court found that A.S. had failed to demonstrate that she can provide a safe, sober, structured, and stable environment for the children. It also found that A.S. "ha[d] failed to demonstrate that she can place the needs of the children over her own needs." The district court found that it was unlikely that A.S. would "demonstrate a sober lifestyle in the reasonably foreseeable future." The district court concluded that the county had made reasonable efforts for reunification of A.S. and her children, but that these reasonable efforts had failed to correct the conditions that led to the children's placement in foster care.

A.S. argues that "the simple fact of [her] chemical use or dependency alone cannot support a termination of parental rights." This argument is unpersuasive. The evidence in the record indicates that A.S. could not adequately parent her children unless she completed chemical-dependency treatment and remained sober. In October 2013, the child psychologist at Stepping Stones told A.S. that, in order to meet her children's needs, she needed to be sober. In February 2014, the licensed psychologist that completed A.S.'s parental-capacity evaluation stated that A.S.'s inability to abstain from alcohol and drugs was the greatest threat to her ability to parent. And, A.S.'s chemical-dependency counselor at Red River testified that A.S.'s abstinence from drugs and alcohol was "very significant" to giving her the stability that she needed to parent her children. A.S. herself acknowledged at trial that abstinence from drugs and alcohol was central to reunification.

All of this evidence indicates that A.S.'s fitness as a parent was directly tied to her ability to become and remain sober.

Moreover, A.S.'s assertion that her parental rights were terminated due to her chemical use *alone* mischaracterizes the record. For example, the out-of-home placement plans required A.S. to complete treatment, remain sober, comply with random urinalysis testing, follow all the recommendations of the parental-capacity evaluation, obtain "stable, suitable housing upon discharge from residential treatment," and meet weekly with her family resource worker. The county determined, and the district court agreed, that this constellation of requirements was necessary to correct the conditions that led to A.S.'s children being placed in foster care. It was A.S.'s failure to complete many of these requirements, not her lack of sobriety alone, which led the district court to terminate her parental rights. Moreover, a parent's "[f]ailure to satisfy requirements of a court-ordered case plan provides evidence of a parent's noncompliance with the duties and responsibilities under section 260C.301, subdivision 1(b)(2)." *In re Welfare of the Children of K.S.F.*, 823 N.W.2d 656, 666 (Minn. App. 2012).

A.S. points out that during supervised parenting-time visits, she was deemed to parent "quite well." The family resource worker testified that during these supervised visits, A.S.'s parenting skills improved and that she was able to interact appropriately with her children. It does not follow, however, that A.S. would be able to properly parent her children on a long-term basis outside of a structured environment. Moreover, when A.S.'s three children stayed with her at Stepping Stones—which was a structured environment—she chose to leave treatment early rather than stay and care for her

13

children. While the district court found that A.S. loves her children and has a bond with them, the record supports the district court's determination that A.S. failed to demonstrate that she can provide a safe, sober, structured, and stable environment for her children, and that she can place her children's needs over her own needs.

A.S. also argues that the county did not make reasonable efforts to correct the conditions that led to out-of-home placement. In TPR proceedings, the district court is required to make findings of fact addressing whether the county has made "reasonable efforts" to reunite the family. *In re Children of T.A.A.*, 702 N.W.2d 703, 709 (Minn. 2005). To determine whether reasonable efforts were made, the district court must consider "whether the services offered to the child and family were: (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014).

A.S. claims that the conditions leading to out-of-home placement had been corrected because "there was clear evidence that A.S. responded positively to treatment." But, she was treated at and unsuccessfully discharged from four chemical-dependency treatment programs in less than a year and a half. And, while she was successfully discharged from Red River in June 2014, she failed to comply with her discharge recommendations because she did not remain sober. A.S. vaguely asserts that she "demonstrated more than 10 months of sobriety," but fails to show how she calculated that time period. She also overlooks the fact that she had a drug-using episode while at Red River.

A.S. argues that the county's efforts were unreasonable because the county did not seek a residential-treatment placement for A.S. and her children after she completed her treatment at Red River. We disagree. The record shows that A.S.'s treatment team considered such an option. The family resource worker and GAL both testified that one such program had a long waiting list and was not taking new names at that time. Moreover, one of the requirements of the case plans was for A.S. to obtain stable housing upon discharge from an inpatient treatment program. Entering another inpatient treatment program would not have furthered this requirement, especially since the children had been in out-of-home placement for over 300 days by the time A.S. was discharged from Red River.

A.S. next argues that the county's efforts were unreasonable because the county did not implement trial home visits or unsupervised parenting time after A.S. was successfully discharged from Red River. She asserts that she complied with "nearly every element" of the case plans after she left Red River. The case plans required A.S. to, among other things, remain sober, comply with random urinalysis testing, and obtain housing. A.S.'s chemical-dependency counselor at Red River testified that, at her discharge, her homeless status was her highest risk factor for relapsing. A.S.'s case manager helped A.S. locate housing both during and after her treatment at Red River. In mid-June, A.S. moved in with a friend. Throughout July and August, A.S. was incarcerated on outstanding warrants. The case manager helped A.S. locate housing in Fergus Falls that became available in September 2014, but A.S. instead chose to remain with a friend in International Falls and use chemicals. A.S.'s argument that it was

unreasonable for the county to limit her contact with her children to supervised parenting time is not supported by the record, which documented that, notwithstanding the numerous services that she had received from the county, she was unable to remain sober and continued to lead an unstable and tumultuous lifestyle.

A.S. next argues that the county's efforts were unreasonable because the county imposed unreasonable housing requirements on her. Under the case plans, A.S. was required to obtain "stable, suitable housing." Her case manager testified that there were two options for A.S. to obtain such housing: she could live in her own apartment, or she could stay with a friend, "as long as the friend would be sober and would comply with UAs."

A.S. claims that it was unreasonable for her to live alone because of her cognitive limitations. During the parental-capacity evaluation, the psychologist determined that A.S.'s cognitive ability level was in the sixth percentile. The psychologist noted, however, that A.S.'s cognitive functioning was "nevertheless within normal limits." The case manager testified that, to her knowledge, A.S. had never "resided on her own by herself or had her own apartment." But, living alone was not A.S.'s only option.

A.S. claims that it was unreasonable for the county to require that, if she lived with a friend, the friend had to be sober. She asserts that this "incredibly invasive" requirement would "deprive potential roommates of the right to consume alcohol or prescription drugs." It is hard to imagine that A.S. would have been penalized if a random urinalysis testing on A.S.'s roommate showed that the roommate was properly taking prescription drugs. We conclude that it was reasonable for the county to require a

16

roommate to be sober, given A.S.'s tendency to relapse when she was staying with friends who used alcohol or drugs. As the county argues, "A.S. had a lengthy history of chemical use[,] and avoidance of any opportunities to use [was] critical for maintaining sobriety."

A.S. next argues that the county's case plans should have "catered" to A.S.'s cognitive limitations because her cognitive limitations "affected [her] ability to understand the obligations necessary to achieve reunification." As noted above, A.S.'s cognitive functioning tested in the sixth percentile. The psychologist added that A.S. was "very likely to be very concrete in her thinking and may benefit more from [hands-on] teaching methods rather than primarily verbal approaches." A.S. alleges that the county made no changes to the case plans to accommodate her cognitive limitations.

The district court noted that the psychologist "did not recommend alternative treatment programs or additional services as it related to [A.S.'s] cognitive functioning." This finding is supported by the psychologist's report and testimony. A.S. admitted at trial that she understood the requirements of the case plans as well as the purpose of the plans. She acknowledged that the family resource worker provided hands-on parenting training. The family resource worker testified that she believed A.S. understood the parenting suggestions that she gave A.S. The GAL testified that, during meetings with A.S., she appeared to understand the topics discussed and the information shared with her.

Finally, A.S. argues that the county's efforts were unreasonable because they did not include parent-child interactive therapy (PCIT). This argument is unpersuasive. As

part of the evaluations of J.R.S. and A.W.S., the child psychologist recommended that A.S. and her children participate in PCIT in order to strengthen A.S.'s relationship with her children and improve her parenting skills. The child psychologist testified that she was hoping to start PCIT at Stepping Stones, but then A.S. chose to quit that treatment program, which was designed to accommodate the return of children to their mother in a structured setting. Once A.S. was unsuccessfully discharged from Stepping Stones, the primary goal for reunification was focused on A.S.'s sobriety. The child psychologist also testified that, because PCIT is a four-month-long process, A.S. was not able to demonstrate sufficient stability during the remainder of the CHIPS proceedings to initiate PCIT. At the same time, the record does demonstrate that the case manager made continual efforts to ensure that A.S. could have supervised parenting time with her children, and the family resource worker met with A.S. on numerous occasions to help A.S. improve her parenting skills.

Moreover, the record demonstrates that the county offered A.S. a long list of services throughout this case, including case-management assistance, multiple chemical-dependency assessments, multiple inpatient and outpatient treatment programs, additional chemical-dependency counseling, urinalysis testing, psychological evaluations, parenting assessments and education, supervised parenting time with her children, transportation assistance so that she could attend parenting time, assistance with finding housing, and attempts at family placement. The record also shows that there was a significant amount of coordination between the case manager, the family resource worker, various chemical-dependency counselors, the GAL, and others. Yet, despite this panoply of services, A.S.

18

continued to submit positive and diluted urine samples, refused to provide urine samples when requested, and did not obtain stable housing. The district court did not err by finding that the county made reasonable efforts for reunification that were directly related to the safety and wellbeing of the children.

Accordingly, the district court's termination of A.S.'s parental rights under Minn. Stat. § 260C.301, subd. 1(b)(2), is supported by the record, and the district court did not abuse its discretion by invoking this basis for terminating A.S.'s parental rights. *See In re Welfare of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011) (stating that if the district court finds facts that support the existence of a statutory basis to terminate parental rights, whether to invoke that statutory basis is discretionary with the district court), *review denied* (Minn. Jan. 6, 2012).

**Affirmed.**