*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1023**

In the Matter of the Welfare of the Children of:
M. S.-I. and J. J., Parents.

**Filed January 22, 2024**
**Affirmed**
**Gaïtas, Judge**

St. Louis County District Court
File No. 69DU-JV-22-258

Benjamin Kaasa, Benjamin Kaasa Law Office, PLLC, Duluth, Minnesota (for appellant-mother M.S.-I.)

Kimberly J. Maki, St. Louis County Attorney, Sara Jankofsky, Assistant County Attorney, Duluth, Minnesota (for respondent St. Louis County Public Health and Human Services)

Kirsten Hambleton, Superior, Wisconsin (guardian ad litem)

Considered and decided by Wheelock, Presiding Judge; Smith, Tracy M., Judge; and Gaïtas, Judge.

**NONPRECEDENTIAL OPINION**

**GAÏTAS**, Judge

In this termination-of-parental-rights (TPR) appeal, appellant-mother M.S.-I. argues that the record does not support the district court's determinations that: (1) respondent St. Louis County Public Health and Human Services (the county) made reasonable efforts toward reunification, (2) a statutory basis exists to involuntarily terminate her parental rights, and (3) termination is in the best interests of the children. Because we conclude that

the district court did not abuse its discretion in terminating mother's parental rights, we affirm.

**FACTS**

Father J.J. and mother are the parents of two minor children, aged 3 (child 1) and 2 (child 2). Following a TPR trial, the district court terminated father's and mother's rights to the children in June 2023, determining that three statutory bases supported termination, the county made reasonable efforts to reunify the family, and termination was in the children's best interests. Mother challenges each of these determinations on appeal.[1] A summary of the proceedings follows.

*CHIPS Petition*

In November 2021, the county received a report that child 2 was in the newborn intensive care unit (NICU) after a premature birth. The hospital reported that child 2's cord blood tested positive for THC and the parents had only visited the NICU four times in a three-week period. According to the hospital, child 2 would be ready for discharge soon and medical providers were concerned about mother's mental health and her ability to care for the child. The hospital ultimately considered child 2 to be abandoned "due to the lack of any parental involvement with the child or in learning his cares and how to meet the special needs related to his prematurity."

Based on the hospital's report, social workers for the county located and met with father and mother, who lived together. They believed that mother was "suffering from

---

[1] Father is not a party to this appeal.

severe post-partum depression" and showed "a lack of observable attachment" with child 1, which, the social workers noted, was "common when mothers are experiencing post-partum depression." They also learned that father was using methamphetamine. Based on concerns about the parents' ability to care for the children, the county decided that it would also seek custody of child 1 for placement if mother did not obtain therapy to address her mental-health and suicidal ideation. Child 1 eventually was placed with a relative, and child 2 was discharged from the hospital into the care of a different foster parent with experience caring for premature babies.

The county petitioned the district court in December 2021 to adjudicate the children as being in need of protection or services (CHIPS). Following a hearing, the children were placed in emergency protective care. Mother subsequently entered a limited admission to the CHIPS petition based on her mental health and the district court adjudicated the children in need of protection or services.

### Mother's Compliance with the County's Reunification Case Plan

Following the CHIPS adjudication, the county worked with the parents to develop a case plan designed to address the issues that led to the children's out-of-home placement. The case plan required mother to: (1) complete a full psychological evaluation with a parenting component and follow all recommendations; (2) maintain "absolute sobriety" and submit to urinalysis tests to monitor sobriety; (3) complete a chemical-use assessment and follow all recommendations, including aftercare; (4) complete a diagnostic assessment and follow all recommendations to address concerns of historical trauma, post-partum depression, and grief; (5) attend visitations with the children; (6) maintain safe and stable

3

housing; (7) attend and complete parenting classes; and (8) maintain contact with the county and the children's guardian ad litem (GAL). The district court approved this case plan and ordered mother to comply with its provisions.

Mother initially "made significant progress" on her case plan. She met with a psychologist and completed a psychological evaluation. Mother also began participating in mental-health services, obtained a chemical-use assessment, and successfully completed parenting classes through the Circles of Security parenting program. Given mother's progress, the county agreed to expand the parents' visits with the children to allow for unsupervised visitation in mother's home. However, shortly before the scheduled trial home visit in June 2022, the county learned that father had stopped following his case plan, and it could not confirm that the children would be safe in the parents' home. The home visit was ultimately canceled, and visits returned to a supervised setting.

After the canceled home visit, the county reported that mother stopped complying with her case plan.

First, mother failed to engage in services to address her mental-health needs. Following mother's psychological evaluation, the psychologist made specific recommendations for mother, which were incorporated into mother's case plan. Although mother initially complied with these recommendations, she stopped cooperating in June 2022. Mother stopped working with a therapist and did not explore other interventions recommended by the psychologist, such as eye movement desensitization and reprocessing, cognitive behavioral therapy, and accelerated resolution therapy, to address her psychological health. The county social worker assigned to the family testified that, at

4

the time of TPR trial, the psychologist had discharged mother for nonattendance and mother was no longer receiving therapy. Mother similarly declined to participate in dialectical behavior therapy or couple's therapy, as recommended. The county also referred the family for intensive family-based services, but these services were formally withdrawn in the summer of 2022 because the parents declined to participate.

Second, mother did not maintain sobriety and abstain from alcohol or nonprescribed mood-altering chemicals. The case plan required mother to submit to random urinalysis tests to monitor her sobriety. Mother complied with the urinalysis requirement when the case plan was first developed. However, mother stopped submitting to urine tests in June 2022 for approximately two-and-one-half months. Mother reengaged with testing in the fall of 2022 and tested positive for THC from the fall of 2022 until January 2023. She provided negative samples in January and February 2023. But after February 2023, mother stopped attending urinalysis appointments. Additionally, mother did not participate in outpatient treatment, as recommended by her chemical-use evaluator, to address her diagnosed chemical-use disorder, severe cannabis-use disorder.

Third, and finally, mother did not maintain regular contact with the county and the GAL. Mother regularly communicated with the family's social worker until the summer of 2022. After then, however, mother had only "limited contact" with the social worker. Mother reengaged briefly in the fall of 2022, but only had "a few" meetings with the social worker. As of the date of the TPR trial, the social worker testified that she had not heard from mother in about a month. The GAL also testified that "there was a long period of time . . . where the parents weren't in contact with social services."

5

***TPR Proceedings and the District Court's Order Terminating Parental Rights***

In August 2022, the county petitioned to involuntarily terminate the parent's parental rights to both children. The petition alleged that the parents: (1) neglected to comply with the duties imposed by the parent and child relationship, (2) failed to correct the conditions that led to the children's out-of-home placement despite reasonable efforts by the county to reunite the family, and (3) neglected the children in foster care. Minn. Stat. § 260C.301, subd. 1(b)(2), (5), (8) (2022).[2]

The district court held a two-day trial and heard testimony from mother, father, four county social workers, the psychologist who evaluated and initially treated mother, the GAL, and mother's cousin. Following trial, the district court terminated father's and mother's parental rights to both children. With respect to mother, the district court concluded that there was clear and convincing evidence that she neglected to comply with the parent and child relationship, failed to correct the conditions leading to the children's out-of-home placement despite reasonable efforts by the county, and neglected the children in foster care. *See id.* The district court further concluded that the county made reasonable efforts to reunify the family and that termination was in the children's best interests.

Mother appeals.

---

[2] The county also alleged that termination was warranted on two additional grounds. *See* Minn. Stat. § 260C.301, subd. 1(a) (permitting termination with the written consent of a parent), (b)(7) (pertaining to an unknown father's lack of entitlement to notice of TPR) (2022). The district court determined that these bases were not applicable to this case, and therefore we do not address them here.

**DECISION**

Mother challenges the termination of her parental rights. Minnesota courts presume that "a natural parent is a fit and suitable person to be entrusted with the care of his or her child." *In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995). Thus, parental rights may only be terminated for "grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). A district court may involuntarily terminate parental rights if: (1) the county made reasonable efforts toward reunification; (2) there is clear and convincing evidence that a statutory condition exists to support termination under Minnesota Statutes section 260C.301, subdivision 1(b); and (3) the proposed termination is in the child's best interests. *See* Minn. Stat. §§ 260C.301, subds. 1(b), 7, 8, .317, subd. 1 (2022); *see also In re Welfare of Child. of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). The county bears the burden of proving these grounds for termination, *In re Welfare of Child of H.G.D.*, 962 N.W.2d 861, 869-70 (Minn. 2021), and must do so by clear and convincing evidence, Minn. R. Juv. Prot. P. 58.03, subd. 2(a). Evidence supporting TPR "must relate to conditions that exist at the time of termination and it must appear that the conditions giving rise to the termination will continue for a prolonged, indeterminate period." *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn. 2011).

Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136-37 (Minn. 2014). "[An appellate court] review[s] the termination of parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by substantial evidence and are not clearly erroneous." *S.E.P.*, 744 N.W.2d at 385. In

7

doing so, we "review the district court's findings of the underlying or basic facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Child. of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *rev. denied* (Minn. Jan. 6, 2012). The appellate court defers to the district court's decision "because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996). Thus, the appellate court does not engage in fact-finding, reweigh the evidence, or "reconcile conflicting evidence." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221-22 (Minn. 2021) (quotation omitted); *see In re Welfare of Child of J.H.*, 968 N.W.2d 593, 601 n.6 (Minn. App. 2021) (applying *Kenney* in a TPR appeal), *rev. denied* (Minn. Dec. 6, 2021). "Consequently, an appellate court need not go into an extended discussion of the evidence to prove or demonstrate the correctness of the findings of the trial court." *Kenney*, 963 N.W.2d at 222 (quotation omitted). Rather, an appellate court's "duty is fully performed after it has fairly considered all the evidence and has determined that the evidence reasonably supports the decision." *Id.* (quotations omitted).

## I. The county made reasonable efforts to reunify mother with the children.

Mother challenges the district court's determination that the county made reasonable efforts to reunify her with the children. Before terminating parental rights, a district court must find that the county made reasonable efforts to reunify the child and the parent, or the district court must absolve the county from having to make those efforts. Minn. Stat. § 260.012(a) (2022). Reasonable efforts are "services that go beyond mere

matters of form so as to include real, genuine assistance." *In re Welfare of Child. of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotations omitted), *rev. denied* (Minn. Mar. 28, 2007). Reasonable efforts consist of those that are:

> (1) selected in collaboration with the child's family and, if appropriate, the child;
> (2) tailored to the individualized needs of the child and child's family;
> (3) relevant to the safety, protection, and well-being of the child;
> (4) adequate to meet the individualized needs of the child and family;
> (5) culturally appropriate;
> (6) available and accessible;
> (7) consistent and timely; and
> (8) realistic under the circumstances.

Minn. Stat. § 260.012(h) (2022). The district court also weighs "the length of the time the county was involved and the quality of effort given." *In re Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. App. 1990), *rev. denied* (Minn. July 6, 1990).

The district court found that the county provided reasonable efforts to correct the conditions that led to the children's out-of-home placement and promote reunification. As to mother, these services included: (1) mental-health treatment, (2) cell phones and payment for service, (3) relative foster care, (4) sobriety testing, (5) psychological evaluations, (6) public-health nursing, (7) comprehensive assessments, (8) coordination with mental-health service providers, (9) parenting classes, (10) intensive family-based services, (11) bus passes, (12) domestic-violence evaluations, (13) coordination with the NICU, (14) safety planning, (15) letters to the housing authority, (16) child-protection investigations, (17) offers for voluntary services through the Parent Support Outreach

9

Program, (18) ongoing child-protection case management, (19) supervised visitation, (20) a trajectory to a trial home visit, and (21) transportation. The district court found that the social workers documented their "noteworthy efforts to engage both parents throughout this case, even when the parents were not willing to communicate." Based on these efforts, the district court found:

> These services have been selected in collaboration with the children's family and tailored to the individualized needs of the children and children's family; relevant to the safety, protection, and well-being of the children, adequate to meet the individualized needs of the children and family, culturally appropriate, available and accessible, consistent and timely, and realistic under the circumstances.

Clear and convincing evidence in the record supports the district court's findings that the county made reasonable efforts to reunify mother with the children. The family's primary social worker testified regarding her efforts to provide mother with mental-health services. The county arranged for a psychological evaluation with a psychologist who recommended, among other things, that mother explore therapy, therapeutic interventions, monitoring for borderline personality disorder, and couple's counseling. Mother either did not participate in, or fully complete, these services. The county also provided mother with a chemical-use assessment and attempted to engage her in outpatient treatment services to address her diagnosed cannabis-use disorder. Mother received parenting classes through Circles of Security. To assist mother with maintaining sobriety, the county provided urinalysis tests, transportation, and a phone and paid phone service to help facilitate her appointments and urinalysis tests. The county also arranged supervised visits with the children. This evidence supports the district court's reasonable-efforts determination.

Mother argues that the district court's findings are clearly erroneous because the district court did not adequately address each factor under section 260.012(h). And she further contends that the county ceased reunification efforts in August and September 2022 and shifted its focus to separating father and mother. We are not persuaded by these objections. The district court's 78-page order shows a careful consideration of the family's needs and the county's efforts to offer assistance. *See* Minn. Stat. § 260.012(h). And, after reviewing the reasonable-efforts factors, the district court concluded that "[r]easonable efforts have been made to reunify the family, and those efforts have proved unsuccessful." The district court outlined the services offered to the family, including mental-health services, child-care services, bus passes, offers of transportation, and supervised visitation. Furthermore, as to mother's second argument, the record evidence does not support her contention that the county stopped providing efforts in 2022. When mother stopped complying with the terms of her case plan in June 2022 by missing urinalysis appointments, the county attempted to reengage mother. The social worker testified that she told mother that "it was important to get back on track with [her case plan requirements] to be able to reunify with her children." This testimony supports the district court's finding that the county attempted to provide services and assistance to the family "throughout this case."

We recognize that "[t]he nature of the services which constitute 'reasonable efforts' depends on the problem presented." *In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn. 1996). As such, "[t]he county's efforts must be aimed at alleviating the conditions that gave rise to out-of-home placement, and they must conform to the problems presented." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 88 (Minn. App. 2012), *rev. denied* (Minn.

11

July 17, 2012). Here, the record contains ample evidence that the services provided—including mental-health services, chemical-dependency programs, and family therapy—were targeted toward mother's unique circumstances and conformed to the problems presented. Thus, given the record evidence, we are satisfied that the district court did not abuse its discretion by determining that the county made reasonable efforts to reunify mother with the children.

## II. A statutory basis exists to support termination of mother's parental rights.

Having determined that the county provided reasonable efforts to reunify mother and the children, we next review the district court's decision to terminate her parental rights for clear and convincing evidence. *See In re Welfare of Child. of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). The district court determined that the county proved three statutory bases for termination because: (1) mother failed to comply with the parent and child relationship, (2) mother failed to correct the conditions leading to the children's out-of-home placement, and (3) the children were neglected and in foster care. Mother challenges each of these conclusions. We determine that clear and convincing evidence in the record demonstrates that mother failed to correct the conditions leading to the children's out-of-home placement under Minnesota Statutes section 260C.301, subdivision 1(b)(5). Based on this determination, we need not address the remaining two statutory bases for termination. *See J.K.T.*, 814 N.W.2d at 92 (recognizing that a reviewing court "need only one properly supported statutory ground in order to affirm a termination order").

Under section 260C.301, a district court may terminate a parent's rights if "reasonable efforts, under the direction of the court, have failed to correct the conditions

12

leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). A reviewing court presumes that reasonable efforts have failed if: (1) the "child has resided out of the parental home under court order for a cumulative period of 12 months," (2) "the court has approved the out-of-home placement plan," (3) the "conditions leading to the out-of-home placement have not been corrected" as shown by the parent "substantially [complying] with the court's orders and a reasonable case plan," and (4) "reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family." *Id.*, subd. 1(b)(5)(i)-(iv).

Mother does not contest—and the record supports—that the first and second factors are satisfied because the children had been in out-of-home placement for 560 days as of the time of trial, and the district court approved a case plan designed to reunite the family. Moreover, as discussed above, we discern no abuse of discretion in the district court's determination that the county made reasonable efforts to reunite mother with the children. Therefore, we need only address whether mother failed to correct the conditions leading to the children's placement out of the home. Upon review, we determine that the record supports the district court's findings that mother failed to correct the conditions leading to the children's removal, and those findings support the district court's ultimate conclusion that a statutory basis supports termination.

The district court found that "[t]he conditions that [led] to the out-of-home placement have not been corrected because neither parent has substantially complied with the Court's Orders or their respective reasonable case plans." It acknowledged that mother made initial progress at the beginning of the case. But the district court found that mother

13

was not complying with her case plan at the time of trial. It noted that, although the "case was initiated due to significant and serious concerns" about mother's mental health, she had not "demonstrated sobriety or engaged in any of the mental health services required to be stable enough to parent her children."

The record supports these findings. The county became involved with the family after learning that child 2 was born prematurely and was in the NICU and the parents were not visiting the child. After meeting with the family, social workers believed that mother was suffering from post-partum depression. The county worked with mother to develop a case plan to address the issues that led to the children's placement out of the home following the CHIPS adjudication. This plan required mother to participate in mental-health treatment, attain sobriety, submit to urinalysis tests, and maintain contact with the county. The psychologist who conducted mother's psychological evaluation diagnosed mother with major depressive disorder, generalized anxiety disorder, and provisionally, borderline personality disorder. To address these concerns, the psychologist recommended that mother work with a psychotherapist, explore interventions to address her psychological heath, attend couple's counseling, and create a safety plan, among other interventions.

Despite these recommendations, mother failed to comply with her court-ordered case plan to address her mental-health issues. During the TPR trial, the family's primary social worker testified that mother was discharged from therapy when she missed too many appointments and was not in therapy at the time of trial. Mother also declined to explore

other interventions to address her psychological health. She also declined to participate in couple's counseling or monitoring for borderline personality disorder.

Mother also failed to follow the requirement to remain sober and abstain from alcohol or nonprescribed mood-altering chemicals. Although mother initially complied with urine testing, she stopped participating in June 2022 and did not reengage for several months. Mother took her last test in February 2023 and did not submit to urine testing thereafter. Additionally, the case plan required mother to complete a chemical-use assessment and follow recommendations. The evaluator recommended that mother participate in an intensive outpatient treatment program, and the social worker discussed community-based options with mother to assist her in completing this treatment. The social worker testified that mother did not enter a treatment program. The witness testimony supports the district court's findings that mother has not corrected the conditions that led to the children's out-of-home placement.

On appeal, mother argues that she substantially complied with her case plan. Like the district court, we commend mother for her initial progress toward meeting her case plan requirements. But sufficient evidence in the record supports the district court's determination that mother did not substantially comply with her case plan or remedy the conditions that led to the children's removal. As previously noted, at the time of the TPR trial, mother was not in compliance with her case plan because she had not followed through with the recommendations of her psychological evaluation, was not receiving therapy to address her mental-health needs, had not demonstrated sobriety, and was not maintaining regular contact with the county.

Moreover, a parent's compliance with a case plan does not invalidate a district court's termination of parental rights under Minnesota Statutes section 260C.301, subdivision 1(b)(5). In *J.K.T.*, the appellant-mother asserted that, because she completed her case plan, clear and convincing evidence did not support termination under section 260C.301, subdivision 1(b)(5). 814 N.W.2d at 89. We rejected this argument, reasoning that while certain conditions can generate a statutory presumption that reasonable efforts failed to correct the conditions leading to out-of-home placement, "there is no converse presumption that completion of [a] case plan amounts to a correction of those conditions." *Id.* Thus, "[t]he critical issue is not whether the parent formally complied with the case plan, but rather whether the parent is presently able to assume the responsibilities of caring for the child." *Id.* Here, as noted, the district court identified numerous services offered to mother. But the district court found that, despite these efforts, mother failed to correct the conditions leading to the children's removal from the home by the time of the TPR trial. The record amply supports these findings. Thus, even if mother complied with some of the conditions of her case plan, that does not compel reversal of the district court's termination decision, which is otherwise supported by the record.

Our scope of review on appeal is "limited to determining whether the findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether they are clearly erroneous." *In re Welfare of D.D.G.*, 558 N.W.2d 481, 484 (Minn. 1997). We conclude that substantial evidence supports the district court's findings, which are not clearly erroneous. Therefore, we hold that the district court did not abuse its

16

discretion in determining that reasonable efforts by the county failed to correct the conditions leading to the children's placement out of the home.

## III. The children's best interests support termination.

Mother challenges the district court's determination that termination is in the best interests of the children. Even if a statutory basis for termination exists, the child's best interests are the "paramount consideration" in a termination proceeding. Minn. Stat. § 260C.301, subd. 7; *see also* Minn. Stat. § 260C.001, subd. 2(a) (2022) (stating that the "paramount consideration" in *all* juvenile proceedings is the best interests of the child). The district court must explain its rationale "for concluding why the termination is in the best interests of the children." *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). In determining a child's best interests, the district court balances: (1) the child's interest in preserving the parent and child relationship, (2) the parent's interest in preserving the parent and child relationship, and (3) any competing interests of the child. Minn. R. Juv. Prot. P. 58.04(c)(2)(ii). "Competing interests include such things as a stable environment, health considerations, and the child's preferences." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). We review a district court's best-interests determination for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905. Because this analysis requires credibility determinations, a reviewing court gives "considerable deference to the district court's findings." *J.K.T.*, 814 N.W.2d at 92. Thus, a "determination of a child's best interests is generally not susceptible to an appellate court's global review of a record, and . . . an appellate court's combing through the record to determine best interests is inappropriate

because it involves credibility determinations." *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn. App. 2009) (quotations omitted).

Here, after considering the best-interests factors, the district court determined that "the balance overwhelmingly favors termination." It acknowledged the testimony from the social workers, father, and mother "that the parents deeply love their children and that their visits go well." The district court then considered the competing interests of the children. It noted that the children are placed together in the same foster home, where they are "receiving all needed services" including "mental health services, numerous NICU follow-up appointments, and physical therapy." The district court found that "[t]he children deserve safety and stability." On balance, the district court concluded that the children's "interests in severing the parent-child relationship distinctly outweigh the parents and children's [interests] in preserving the relationship."

We find ample support for these findings in the record. The social worker testified about the children's placement and noted that the children are together in the same foster home. The foster parents are committed to being a permanency option for the children. The social worker described the children as "excelling" and "doing wonderful," and noted that they have "bonded with their . . . foster family." Further, the evidence supports the finding that the children are receiving the care and services they need. Child 1 is receiving ongoing services for his mental health. And child 2, who was born prematurely, is developmentally on track.

The social worker testified that she believes the parents love their children and want to parent them. However, she testified that she does not believe the children would be safe

in their care at this time. The social worker confirmed that, in her belief, it is in the children's best interests that parental rights be terminated. The GAL echoed the social worker's opinion. She testified that she believes TPR is in the children's best interests. In forming that opinion, the GAL testified about her observations of the supervised visits and the children's progress in their current foster placement. She testified that there were often long gaps between the visits when the parents were not in contact with the county. The GAL stated that the parents did not seem to be "looking out for the best interests of their children long term." She testified that, by contrast, the children were doing well in their foster placement. According to her, the foster parents are helping the children with behavioral concerns, special needs, and mental-health needs. Based on the testimony presented, which the district court credited, it concluded that the children's needs are being met in their current placement.

The record demonstrates that the district court balanced the children's interests in a safe, sober, and stable living environment against mother's interest in maintaining the parent and child relationship. Considering all the factors together, the district court concluded that the interests weighed in favor of terminating mother's parental rights. We conclude that the district court's decision does not constitute an abuse of discretion because the court carefully weighed the competing interests of mother and the children, and the testimony supports these best-interests findings.

**Affirmed.**